723 F.2d 195
 220 U.S.P.Q. 321, 1984 Copr.L.Dec. P 25,604,
9 Media L. Rep. 2489
 HARPER & ROW, PUBLISHERS, INC. and the Reader's Digest
Association, Inc., Plaintiffs-Appellees-Cross-Appellants,
v.
NATION ENTERPRISES and the Nation Associates, Inc.,
Defendants-Appellants-Cross-Appellees.
 Nos. 143, 261, Dockets 83-7277, 83-7327.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 14, 1983.
Decided Nov. 17, 1983.
 
 Floyd Abrams, Cahill, Gordon & Reindel, New York City (Devereux Chatillon, Carol E. Rinzler, New York City, of counsel), American Civil Liberties Union, New York City, Andrew L. Deutsch, New York City, of counsel, and Leon Friedman, Hofstra University School of Law, Hempstead, N.Y., of counsel, for defendants-appellants-cross-appellees.
 George Freeman, The New York Times Company, New York City, of counsel, for amici curiae The New York Times Co., Scientific American, Inc., The New York Review of Books, The Progressive, Inc. and the Reporters Committee for Freedom of the Press.
 Stephen Gillers, New York City, of counsel, for amicus PEN American Center.
 Roger L. Zissu, Cowan, Liebowitz & Latman, P.C., New York City (Alan Latman, Jane C. Ginsburg, David Otis Fuller, Jr., Christopher Goff, New York City, of counsel), for plaintiff-appellee cross-appellant The Reader's Digest Association, Inc.
 Edward A. Miller, New York City, of counsel, for plaintiff-appellee-cross-appellant Harper & Row, Publishers, Inc.
 Weil, Gotshal & Manges, New York City, Paskus, Gordon & Hyman, New York City, for amicus curiae Association of American Publishers, Inc.
 Before KAUFMAN, MESKILL and PIERCE, Circuit Judges.
 IRVING R. KAUFMAN, Circuit Judge:
 
 
 1
 Almost ten years ago, this nation endured a grave threat to its domestic political life. The report of a burglary at Democratic National Headquarters in the Watergate complex of Washington, D.C. led to a historic constitutional confrontation. The President, suspected of involvement in covering up the crime and its partisan origins, pitted his will against the resolve of a Congress endeavoring to discover the true facts. The citizens of this country watched with awe as revelation after revelation led finally to the first resignation of a President of the United States. This singular event was followed by another equally unprecedented act. Richard M. Nixon, not yet indicted for the commission of any crimes, was pardoned for any offenses by his successor in office, President Gerald Ford.
 
 
 2
 Reverberations from those shocks to the nation's constitution are still being felt, and this case is another of those repercussions. Two publishers have come before this court to urge that a magazine's use of material contained in the memoirs of Gerald Ford, and concerned in large part with the Nixon pardon, constitutes a violation of the Copyright Act, 17 U.S.C. Secs. 101 et seq. Harper & Row, Publishers, Inc. and The Reader's Digest Association, Inc. (hereinafter "Harper & Row" and "Reader's Digest," respectively) ask us to affirm the trial court's award of damages to them on grounds the Nation Enterprises and The Nation Associates, Inc. (hereinafter "the Nation") improperly took expression used by Ford in his book, A Time To Heal. Because we do not believe it is the purpose of the Copyright Act to impede that harvest of knowledge so necessary to a democratic state, we reverse. The trial court's dismissal of certain state law claims, however, is affirmed. Before turning to the law, we set forth the facts.
 
 I.
 
 3
 If the first notes of this case were sounded during the days of Watergate, its earliest echo was an agreement consummated on February 28, 1977, one month after Gerald Ford had left the White House. At that time, the former President granted Harper & Row and Reader's Digest exclusive rights to publish his yet unwritten memoirs. The book, according to Harper & Row, was to include, among other things, "the circumstances and reasoning surrounding the pardon of Mr. Nixon by Mr. Ford." By the terms of the contract, Ford acknowledged he must help to guard the value of those rights by avoiding participation in any "public discussion of the unique information not previously disclosed" about his career. He therefore agreed "not to disseminate any such information in any media ... prior to publication." While "spontaneous and brief" comments were not to be considered a breach of contract, the publishing agreement was influential in Ford's later decision not to appear on an NBC television special in which the pardon was to be a central topic.
 
 
 4
 A professional writer, Trevor Armbrister, was hired to assist Ford in the process of gathering up strands of the past. Material was culled from a variety of sources including numerous interviews with public figures, among them Alexander Haig, Nelson Rockefeller, and Henry Kissinger. In addition, Ford and Armbrister made tape recordings in which the former President recollected both private and public aspects of his life. In February 1979, a first draft was completed by Armbrister. In addition to the information on the pardon of Nixon and events leading up to that historic choice, the book included depictions of Ford's childhood, his extensive career in Congress, his family life, his perceptions of a number of public figures, and the paths he followed after serving as President. Ford reviewed and edited this version of his experiences, and when it was near completion in March of that year, his publishers licensed to Time magazine the exclusive rights to print pre-publication excerpts in their issue of April 23rd. Time paid $12,500 in advance for this privilege, and was to pay an additional $12,500 when its edition containing selected segments was complete.
 
 
 5
 But the resonant note of the past was not yet stilled. In late March 1979, an unidentified person brought a copy of the Ford manuscript to Victor Navasky, Editor of The Nation, a magazine devoted in large part to political commentary and news. Mr. Navasky testified, with no contradiction, that he had neither solicited nor paid for delivery of the book. Nor was he aware upon its receipt of Time's pre-publication rights, although he did admit to realizing his temporary possession of the manuscript had not been authorized by Harper & Row or Reader's Digest. Believing the book to contain important political news, including heretofore undisclosed facts on the pardon, Navasky worked frenetically throughout a night and part of a weekend to read the memoirs in their entirety and select material germane to a news article before returning the copy to its source. He also consulted counsel concerning possible copyright violations and was advised that his proposed use was permissible.
 
 
 6
 On April 3, 1979, in an issue of The Nation dated April 9, 1979, the article which is the focus of this suit appeared. Navasky had learned by then of Time's publication plans, although he remained unsure of the precise contents which that magazine intended to excerpt. An ironic detail of the case is that much of the information concerning the pardon turned out to have been already revealed by Ford during the 1974 Hungate Committee investigation of that Presidential decision. Navasky, however, was unaware at the time he wrote that his piece was a hybrid, history to those who knew these facts, news to those who did not. It is enough to add here that the Nation's receipts from newsstand sales were $418.00.
 
 
 7
 The magazine article, a copy of which is reprinted in the Appendix to this opinion, was approximately 2,250 words in length and was contained in three two-column pages. The manuscript, in comparison, was nearly 200,000 words and covered 655 typed pages. The first three paragraphs in The Nation piece summarized the factual highlights and announced the expected publication dates of A Time To Heal as well as the advance excerpts in Time and The Reader's Digest. That introduction was followed by nineteen paragraphs concerning the decision to pardon Nixon. Significant conversations are recorded, including several between then Vice President Ford and Alexander Haig and Ford and various of his associates. Portions of a memorandum written by Henry S. Ruth, Jr., an aide to Special Prosecutor Leon Jaworski, are quoted. In addition, Ford's reasons for the pardon are described, as is the fact that his emotional reaction to Nixon did not influence his choice. Finally, a brief paragraph on Ford's impressions of Nixon, ill with phlebitis following his resignation and pardon, is copied from the book.
 
 
 8
 The article then recounts information on Ford's relations with Kissinger and several other historically significant episodes, including the seizure of the MAYAGUEZ and Ford's decision to run for a full term as President. That material is followed by four paragraphs in which Ford's perceptions and evaluations of Nixon's character and actions, including Nixon's response to the awesome consequences of Watergate, are portrayed. The article then ends with a reference to the problem of the disclosure of political events like those described in The Nation, and mentions the Washington Post's earlier unauthorized publication of excerpts from the memoirs of H.R. Haldeman, one of Nixon's closest advisors during the Watergate period.
 
 
 9
 All the information contained in the article dealt with Ford's public and political life. Harper & Row and Reader's Digest describe the material used by The Nation as barely disguised paraphrasings or direct thefts of Ford's original expression. The Nation asserts it did no more than relate facts of momentous public import, particularly since Ford and Haig were then considered serious contenders for the 1980 Republican Presidential nomination. It claims it borrowed only the minimum expression essential to lend credibility to the piece. Because these conflicting characterizations of The Nation article are at the heart of this case, we return to them in our legal discussion.
 
 
 10
 On the day The Nation article appeared, Mr. Ray Cave of Time requested permission to publish the excerpts in its April 16, 1979 issue instead of the April 23rd issue as previously agreed. Because of what its counsel described as a careful program coordinating the Time printing and the book's release, Harper & Row refused. As a result, Time did not publish any of the manuscript, nor did it pay the additional $12,500. Harper & Row and Reader's Digest then brought this suit against the Nation for copyright infringement and for certain state law violations, including conversion.
 
 
 11
 The trial judge dismissed the state law claims upon motion, finding them preempted by the Copyright Act, 17 U.S.C. Sec. 301. Harper & Row, Publishers, Inc. v. Nation Enterprises, 501 F.Supp. 848 (S.D.N.Y.1980).[1] After a non-jury trial consuming six days, Judge Owen held that the Nation had infringed Harper & Row's and Reader's Digest's copyright and had failed to persuade him that they had made a "fair use" of the borrowed material. Harper & Row, Publishers, Inc. v. Nation Enterprises, 557 F.Supp. 1067 (S.D.N.Y.1983).
 
 II.
 
 12
 Because the state law claims were disposed of at the outset of this action, we consider those issues before turning to the more troublesome question of copyright infringement.
 
 
 13
 Harper & Row and Reader's Digest cross-appeal from the order dismissing these claims on grounds they are preempted by the Copyright Act. They urge us to find the Nation liable for conversion and tortious interference with contractual rights,[2] alleged harms arising out of the same facts on which the charge of copyright infringement is based.
 
 
 14
 The Copyright Act sets out the test for preemption of that state statutory or common law which may conflict with the federal policies embodied in the Act.[3] The section contains a two-part analysis. First, the work of authorship in which rights are claimed must fall within the "subject matter of copyright" as defined in Secs. 102 and 103 of the Act. Cross-appellants do not appear to contest that the Ford memoirs fall within the ambit of federal protection. In any event, the Act clearly embraces "[w]orks of authorship," including "literary works," as within its subject matter. 17 U.S.C. Sec. 102. The fact that portions of the Ford memoirs may consist of uncopyrightable material, an issue discussed below, does not take the work as a whole outside the subject matter protected by the Act. See H.R.Rep. No. 1476, 94th Cong., 2d Sess. 131 (1976), 1976 U.S.Code Cong. & Ad.News 5659, 5747; Durham Industries, Inc. v. Tomy Corp., 630 F.2d 905, 919 (2d Cir.1980). Were this not so, states would be free to expand the perimeters of copyright protection to their own liking, on the theory that preemption would be no bar to state protection of material not meeting federal statutory standards. That interpretation would run directly afoul of one of the Act's central purposes, to "avoid the development of any vague borderline areas between State and Federal protection." H.R.Rep. No. 1476, supra, at 130, U.S.Code Cong. & Admin.News 1976, at 5746.
 
 
 15
 The statute also requires that a state law create "legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified in section 106"[4] if it is to be preempted. These include the rights "to reproduce the copyrighted work in copies" and "to prepare derivative works based upon the copyrighted work." When a right defined by state law may be abridged by an act which, in and of itself, would infringe one of the exclusive rights, the state law in question must be deemed preempted. Oboler and Nostalgia Lane, Inc. v. Goldin, et al., 714 F.2d 211 at 213 (2d Cir.1983); Orth-O-Vision, Inc. v. Home Box Office, 474 F.Supp. 672, 683-84 (S.D.N.Y.1979); 1 Nimmer on Copyright Sec. 1.01[B] at 1-11 (1983). Conversely, when a state law violation is predicated upon an act incorporating elements beyond mere reproduction or the like, the rights involved are not equivalent and preemption will not occur. Factors, etc., Inc. v. Pro Arts, Inc., 496 F.Supp. 1090, 1099 (S.D.N.Y.1980), rev'd on other grounds, 652 F.2d 278 (2d Cir.1981), reh'g denied, 701 F.2d 11 (2d Cir.1983), cert. denied, 456 U.S. 927, 102 S.Ct. 1973, 72 L.Ed.2d 442 (1983).
 
 
 16
 Cross-appellants argue that neither of their state law claims allege rights equivalent to those created by the Act. With regard to the issue of conversion, cross-appellants seem unable to decide how to plead the factual elements supporting their claim. Their amended complaint asserted conversion based on the unauthorized publication of The Nation article. In this court, they propound a theory which rests the tort upon the unlawful possession of the physical property of the Ford manuscript. In doing so, they have placed themselves neatly upon the horns of a dilemma. If unauthorized publication is the gravamen of their claim, then it is clear that the right they seek to protect is coextensive with an exclusive right already safeguarded by the Act--namely, control over reproduction and derivative use of copyrighted material. As such, their conversion claim is necessarily preempted.
 
 
 17
 Alternatively, Harper & Row and Reader's Digest suggest it is the possession of the papers themselves which lays the foundation for their claim. Conversion, as thus described, is a tort involving acts--possession and control of chattels--which are qualitatively different from those proscribed by copyright law, and which therefore are not subject to preemption. Cross-appellants have failed, however, to state a conversion claim. Conversion requires not merely temporary interference with property rights, but the exercise of unauthorized dominion and control to the complete exclusion of the rightful possessor. Citizens Nat'l Bank v. Osetek, 353 F.Supp. 958, 963 (S.D.N.Y.1973); AMF Inc. v. Algo Distributors, Ltd., 48 App.Div.2d 352, 356, 369 N.Y.S.2d 460, 464 (2d Dep't 1975); 1 F. Harper & F. James, The Law of Torts Sec. 2.15 (1956); cf. Restatement (Second) of Torts Sec. 222A (1965). Merely removing one of a number of copies of a manuscript (with or without permission) for a short time, copying parts of it, and returning it undamaged, constitutes far too insubstantial an interference with property rights to demonstrate conversion.[5] See Pearson v. Dodd, 410 F.2d 701, 707 (D.C.Cir.1969), cert. denied, 395 U.S. 947, 89 S.Ct. 2021, 23 L.Ed.2d 465 (1969). Thus, whatever factual predicate they choose, Harper & Row and Reader's Digest cannot succeed on this ground.
 
 
 18
 With respect to the claim of tortious interference with contractual relations, cross-appellants' statement of the cause of action in their complaint suggests its infirmity. They allege that cross-appellees have committed a tort "by destroying the exclusive right of an author and his licensed publishers to exercise and enjoy the benefit of the pre-book publication serialization rights." If there is a qualitative difference between the asserted right and the exclusive right under the Act of preparing derivative works based on the copyrighted work, we are unable to discern it. In both cases, it is the act of unauthorized publication which causes the violation. The enjoyment of benefits from derivative use is so intimately bound up with the right itself that it could not possibly be deemed a separate element. See 1 Nimmer on Copyright Sec. 1.01[B], at n. 46 (1983). As the trial court noted, the fact that cross-appellants pleaded additional elements of awareness and intentional interference, not part of a copyright infringement claim, goes merely to the scope of the right; it does not establish qualitatively different conduct on the part of the infringing party, nor a fundamental nonequivalence between the state and federal rights implicated. Harper & Row, Publishers, Inc. v. Nation Enterprises, supra, 501 F.Supp. at 853-54; accord, Kamakazi Music Corp. v. Robbins Music Corp., 522 F.Supp. 125, 137 (S.D.N.Y.1981), aff'd, 684 F.2d 228 (2d Cir.1982).
 
 
 19
 We therefore hold that cross-appellants cannot prevail on either of their state law claims, and proceed to an examination of the copyright infringement claim.III.
 
 
 20
 The trial court began its opinion on copyright infringement by considering whether The Nation article was news reporting and, if so, whether The Nation had made a "fair use" of the memoirs. As a result, it did not face, at the outset, the threshold issue whether the material used by the magazine was copyrightable. We commence this part of our discussion, then, by turning our attention to that question, putting aside the matter of "fair use" until we have decided if any use of copyrighted expression did, in fact, occur.
 
 A.
 
 21
 The Copyright Act, enacted pursuant to Article I, Sec. 8, cl. 8 of the United States Constitution, protects only original works of authors. 17 U.S.C. Sec. 102(a).[6] The statute grants rights not in ideas or facts, but in expression, 17 U.S.C. Sec. 102(b).[7] The Act is thus able to protect authors without impeding the public's access to that information which gives meaning to our society's highly valued freedom of expression. See 1 Nimmer on Copyright Sec. 1.10[B], at 1-72 (1983). Courts have accordingly held that neither news events, Time Incorporated v. Bernard Geis Associates, 293 F.Supp. 130, 143 (S.D.N.Y.1968), citing International News Service v. Associated Press, 248 U.S. 215, 234, 39 S.Ct. 68, 70, 63 L.Ed. 211 (1918), historical facts, Hoehling v. Universal City Studios, Inc., 618 F.2d 972 (2d Cir.), cert. denied, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980), nor facts of a biographical nature, Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir.1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), is deserving of the protection of the Act. See also Wainwright Securities, Inc. v. Wall Street Transcript Corp., 558 F.2d 91 (2d Cir.1977), cert. denied, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978).[8]
 
 
 22
 The distinction between fact and expression is not always easy to draw. There are, however, several general principles according to which that boundary may be mapped for works in which much factual material is described. An author's originality exists, in part, in his overall arrangement of facts. The structure he chooses for the work as a whole is important. See Wainwright Securities, Inc. v. Wall Street Transcript Corp., supra, 558 F.2d at 94, and Meredith Corp. v. Harper & Row, Publishers, Inc., 378 F.Supp. 686 (S.D.N.Y.1974), aff'd, 500 F.2d 1221 (2d Cir.1974). In this case, there can be no concern that this mode of expression was usurped; The Nation article drew only upon scattered parts and not the total entity with its unique and protected mosaic.
 
 
 23
 Harper & Row and Reader's Digest insist, however, that a second expressive mode, the author's chosen language, was taken by virtue of short segments of verbatim quotation and the liberal use of paraphrasing. While we agree some of Ford's literal words were copyrightable,[9] a conclusion to which we will return in our discussion of "fair use," we reject the argument that paraphrasings of disparate facts such as those found in this case constitute an infringement of copyrightable material. The dissent's blanket statement that paraphrasing is the equivalent of copying is simply inaccurate. The cases in which that equation is made differ significantly from this litigation. They concern instances in which an alleged infringer borrowed virtually an entire work and attempted to avoid liability by doing little more than changing the verbatim language or slight details in the structure.[10] The dissent's generalization about paraphrasing is valid when applied to such cases for reasons once stated by Judge Learned Hand:
 
 
 24
 It is of course essential to any protection of literary property, whether at common-law or under the statute, that the right cannot be limited literally to the text else a plagiarist would escape by immaterial variations. Nichols v. Universal Pictures Corp., 45 F.2d 119, 121 (2 Cir.1930).
 
 
 25
 If The Nation had taken, for example, all of the book or all of a chapter and merely changed the language here and there, paraphrasing would not and should not suffice to protect it.
 
 
 26
 But that is not this case. Here, The Nation drew on scattered pieces of information from different pages and different chapters, and then described that information in its own words. This is precisely the situation to which Nimmer refers in his treatise when he writes:
 
 
 27
 What if the defendant has copied neither the plaintiff's word for word form of expression, nor the selection and arrangement of plaintiff's facts, but has nevertheless copied one or more facts which appear in plaintiff's factual work? Here the answer on principle should be that plaintiff cannot establish copyright infringement." 1 Nimmer on Copyright Sec. 2.11[E] at 2-164 (1983).[11]
 
 
 28
 Our dissenting brother's excessively broad generalization about paraphrasing fails to recognize the essential need to strike a definitional balance between the First Amendment and the Copyright Act by permitting the free communication of facts while still protecting an author's expression. A construction of the Act insisting it is impermissible copying to paraphrase discrete facts ignores the unambiguous legislative history which establishes that "information" is not protected. H.R.Rep. No. 1476, 94th Cong., 2d Sess. 56 reprinted in 1976 U.S.Code Cong. & Ad.News 5659, 5670. Were information copyrightable as the dissent implies, the Act would clash with the First Amendment on every occasion in which an author chose to put in his own words facts which had already been described by another writer. See generally Goldstein, Copyright and the First Amendment, 70 Colum.L.Rev. 983 (1970).
 
 
 29
 Nowhere could the need to construe the concept of copyrightability in accord with First Amendment freedoms be more important than in the instant case. Here we are presented with an article describing political events of major significance, involving a former President of the United States. The paraphrasings concern the very essence of news and of history. In such works, courts have carefully confined that troublesome concept "expression" to its barest elements--the ordering and choice of the words themselves. See Hoehling v. Universal Studios, Inc., supra, 618 F.2d at 974. Were "expression" in this context given a broader terrain, an individual could be the owner of an important political event merely by being the first to depict that event in words. See International News Service v. Associated Press, supra, 248 U.S. at 234, 39 S.Ct. at 70, and Brief for Pen American Center, Amicus Curiae, at 21-25.[12]
 
 
 30
 The trial court, however, would have us accept a novel theory concerning the copyrightability of historical fact and memoranda. It found such material integral to "Ford's revelations as to his state of mind while involved in governmental affairs of the highest consequence." Harper & Row, Publishers, Inc. v. Nation Enterprises, supra, 557 F.Supp. at 1073. As a result, the court conferred copyright protection on material it admitted was not "per se copyrightable." Id., 557 F.Supp. at 1072. The core of the court's reasoning appears to be grounded in its statement that "it is the totality of these facts and memoranda collected together with Ford's reflections that made them of value to the Nation. Correspondingly, it is this same totality that is protected by the copyright laws." Id.
 
 
 31
 Two assumptions seem to inhere in this reasoning. The district court appeared to believe Ford's "revelations as to his state of mind," standing alone, were copyrightable. Id., 557 F.Supp. at 1073.[13] Appellees agree, urging in their brief that this element of the autobiography of a public official is precisely that personal and subjective note which renders it the essence of expression. We need not decide here whether these depictions belong more properly to the sphere of fact or that of expression, for with the exception of a word or two, they are taken verbatim from the book, and the literal words are unquestionably copyrightable. But we note in passing, though it is true these responses did originate with Ford and might be accurately described as his unique perspective, it seems to defy common sense to declare that the "states of mind" which play a role in the crucial political decisions of public officials are any less "fact" than any act which such an official may choose or not choose to undertake.[14]
 
 
 32
 Accepting, however, that the verbatim "reflections" in this case are "expression", the district court's second assumption, that their coupling with uncopyrightable fact transformed that information into a copyrighted "totality," is an erroneous construction of the statutory "subject matter." 17 U.S.C. Sec. 102. That conception of the law is tantamount to permitting a public official to take private possession of the most important details of a nation's historical and political life by adding language here and there on the perceptions or sentiments he experienced while in office and insisting the work's entire contents are thereby made his alone by virtue of copyright. The Copyright Act was not intended to provide such a private monopoly of fact at the expense of the public's need to be informed. Hoehling v. Universal City Studios, Inc., supra; Berlin v. E.C. Publications, Inc., 329 F.2d 541 (2d Cir.1964), cert. denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964).[15]
 
 
 33
 Additional reasons preclude a finding that much of this material is copyrightable. A great deal of the information concerning the pardon decision was presented by President Ford before the Hungate Committee and subsequently printed in a government document. Pardon of Richard M. Nixon, and Related Matters: Hearings Before the Subcommittee on Criminal Justice of the House Committee on the Judiciary, 93rd Cong., 2d Sess. at 90-151 (1974). This material was a "work of the United States Government," 17 U.S.C. Sec. 105, and hence not copyrightable.[16] See also 1 Nimmer on Copyright Sec. 4.04, at 4-17 (1982). No individual can claim such matter as his own. Greenbie v. Noble, 151 F.Supp. 45, 66 (S.D.N.Y.1957).
 
 
 34
 Moreover, the use of conversations attributed to other persons cannot be a borrowing of copyrighted material, because of the Act's requirement, 17 U.S.C. Sec. 102(a),[17] that an author's work be his own and not originate in others. See Suid v. Newsweek Magazine, 503 F.Supp. 146, 148 (D.D.C.1980); Norman v. Columbia Broadcasting System, Inc., 333 F.Supp. 788, 798 (S.D.N.Y.1971). The same originality criterion applies to the memorandum written by Henry S. Ruth and taken by Trevor Armbrister from a copyrighted book by Leon Jaworski.
 
 
 35
 Appellants ask us to find that the words Ford spoke when he was in office may not be copyrighted by him as they, too, are "work[s] of the United States Government." 17 U.S.C. Sec. 105. We cannot go so far. The conversations originated with Ford, and, unlike the testimony before the Hungate Committee, were neither fixed as "writings" nor publicly delivered as part of any person's "official duties." 17 U.S.C. Sec. 101. Indeed, it pushes language beyond its common sense bounds to characterize Ford's conversational words as "a work prepared" by him. Id. Although another may pluck the facts from unrecorded words uttered by a public official while carrying out his public tasks, the phrasing of the sentence itself may be copyrighted by that official if and when it is later written down.
 
 
 36
 When the uncopyrighted material is stripped away, the article in The Nation contains, at most, approximately 300 words that are copyrighted. These remaining paragraphs and scattered phrases are all verbatim quotations from the memoirs which had not appeared previously in other publications. They include a short segment of Ford's conversations with Henry Kissinger and several other individuals. Ford's impressionistic depictions of Nixon, ill with phlebitis after the resignation and pardon, and of Nixon's character, constitute the major portion of this material. It is these parts of the magazine piece on which we must focus in our examination of the question whether there was a "fair use" of copyrighted matter.
 
 B.
 
 37
 The Copyright Act provides two mechanisms by which the rights of a copyholder may be protected without impeding the public's access to information. The first of these devices, the distinction between expression, which is copyrightable, and idea or fact, which is not, has been discussed above. The second means of ensuring a proper balance of the citizenry's need to be informed and the author's monopoly of his original writings is known as the doctrine of "fair use." See Wainwright Securities, Inc. v. Wall Street Transcript Corporation, supra, at 558 F.2d at 94. This common law concept, now embodied in the Copyright Act, permits the limited use of copyrighted material without the author's consent for purposes "such as criticism, comment, news reporting, teaching ..., scholarship, or research...." The court is required to consider at least four factors in deciding whether a particular use was fair. 17 U.S.C. Sec. 107.[18]
 
 
 38
 The trial court characterized its task as deciding "whether the Nation's article was 'news reporting', and, if so, was a 'fair use' of the materials taken." Harper & Row, Publishers, Inc. v. Nation Enterprises, supra, 557 F.Supp. at 1070. We find the court's conclusion that "the piece was not such news, 'hot' or otherwise, as to permit the use," id., 557 F.Supp. at 1072, to be clearly erroneous for several reasons. The testimony of Navasky that his purpose in writing the article was news reporting was uncontradicted. In addition, three expert journalists testified to the news purpose of The Nation piece. Even in the absence of such expertise, however, our own examination of this article concerning a new book on the actions of the highest public officials in their official positions leads us to conclude that it must be characterized as the reporting of either news or of recent history. While it is true, as appellees state, that mere allegations of news reporting are insufficient grounds for permitting the copying of the expression in a protected work, this is not a case such as Zacchini v. Scripps-Howard Broadcasting Co., 433 U.S. 562, 97 S.Ct. 2849, 53 L.Ed.2d 965 (1977), in which the media made use of someone's "entire [expressive] act" while claiming it was fulfilling a news function. Furthermore, there was no evidence of that "chiseling for personal profit" which led this Court in Wainwright Securities, Inc. v. Wall Street Transcript Corporation, supra, 558 F.2d at 97, to find a claim of news reporting was merely a pretext.
 
 
 39
 Moreover, a careful reading of the opinion reveals that the district judge decided the piece was not news reporting because it contained insufficient "hot news" to be so classified. The court, in short, substituted its own views concerning the quality of the journalism in The Nation article, and then determined that it was not news because it was not good or genuine news. There is no indication in either the statutory language or the case law that determination of fair use should turn on the question of how well a given purpose was performed. Indeed, this Court has eschewed judicial evaluation of quality in fair use analysis. Rosemont Enterprises, Inc. v. Random House, Inc., supra. The authority on which the court relied, Wainwright Securities, Inc. v. Wall Street Transcript Corporation, supra, is concerned not with the quality of an alleged news report, but with whether labelling the use of another's financial analyses and predictions "news reporting" was a pretext for usurping a creative effort.
 
 
 40
 We fully agree with our brother Meskill that courts should be "chary" of deciding what is and what is not news. We fear, however, that he has not followed his own admonition. His dissent proceeds to describe what a news article "might choose to include" and then asserts later in his opinion, that " 'legitimate coverage of a news event,' id., will thus contain original material." We are of the view that the recounting of information, without more, would seem to be the very essence of "news reporting." Our main concern, however, is that the task of courts in "fair use" analysis should be understood not as deciding what makes bona fide news, but as examining whether a claim of "news reporting" is false.[19]
 
 
 41
 Furthermore, our brother Meskill's requirement that legitimate news add original commentary or contain original research sounds distinctly like an assertion that "fair use" turns on the amount of the user's labor. The Second Circuit has rejected that approach.[20] In Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d at 310, this court wrote:
 
 
 42
 It is just such wasted effort [as having to do original research, for example] that the proscription against the copyright of ideas and facts, and to a lesser extent the privilege of fair use, are designed to prevent. See Gorman, Copyright Protection for the Collection and Representation of Facts, 76 Harv.L.Rev. 1569, 1584 (1963). Id.[21]
 
 
 43
 Judge Owen then proceeded to dispose of each of the four "fair use" factors which must be considered, 17 U.S.C. Sec. 107. He found the "purpose or character" was that "the article was published for profit." Harper & Row, Publishers, Inc. v. Nation Enterprises, supra, 557 F.Supp. at 1072. But the fact that profit was involved is, without more, legally irrelevant where the work in which the use appears offers some benefit to the public. Rosemont Enterprises, Inc. v. Random House, Inc., supra, 366 F.2d at 307.
 
 
 44
 The court's analysis of the second of the factors, the "nature of the copyrighted work," was also faulty, for it ignored the essentially factual nature of the book. No consideration was given to the fact that copyright protection of such works is narrow, Hoehling v. Universal Studios, supra, 618 F.2d at 974. Moreover, the court did not examine which portions used by The Nation were deserving of such protection. This approach led to its erroneous conclusions concerning a copyrightable "totality."
 
 
 45
 The treatment of the third and fourth factor is colored by this erroneous "totality" analysis. The court noted The Nation article had used "the heart of the book," a statement based on a finding that material dealing with the Nixon pardon had been taken. Harper & Row, Publishers, Inc. v. Nation Enterprises, supra, 557 F.Supp. at 1072. This conclusion, even if correct, is irrelevant, for the "heart" to which the court makes reference is factual information of great public import, and not the expression or the "analyses and predictions," Wainwright Securities, Inc. v. Wall Street Transcript Corporation, supra, 558 F.2d at 96 which are protected by copyright. The quantitative amount of copyrighted words, some 300 in an article of over 2,250, is insubstantial. The court found "economic impact" because "the effect of The Nation's extensive use of the Nixon pardon material caused the Time agreement to be aborted ...." Harper & Row, Publishers, Inc. v. Nation Enterprises, supra, 557 F.2d at 1072. But, as we have indicated, almost all that material was uncopyrightable information in which Harper & Row and Reader's Digest may not claim ownership. At the same time, the evidence does not support a finding that it was the very limited use of expression per se which led to Time 's decision not to print excerpts. The district court erred, in short, in its analysis of the "fair use" factors.
 
 
 46
 The copyrightable material used by The Nation was, for the most part, either Ford's own words in conversations or his portrayals of Richard M. Nixon. The brief conversational passages are no more than Ford's replies to the statements of others. They lend authenticity to this politically significant material. The short descriptions of Nixon's character provide the reader with a means of evaluating Ford's estimate of Nixon and his claim that he did not act out of compassion in granting a pardon, thus complementing the reporting of the facts. In sum, the quotations are informative and are neither superfluous or excessive for the article's purpose. We reject the notion that this very limited use of copyrighted words is sufficient "to supersede the use of the original work." Folsom v. Marsh, 9 Fed.Cas. No. 342 (C.C.D.Mass.1841) (No. 49091).
 
 
 47
 Where information concerning important matters of state is accompanied by a minimal borrowing of expression, the economic impact of which is dubious at best, the copyright holder's monopoly must not be permitted to prevail over a journalist's communication. To decide otherwise would be to ignore those values of free expression which have traditionally been accommodated by the statute's "fair use" provisions. Wainwright Securities, Inc. v. Wall Street Transcript Corp., supra, 558 F.2d at 95. We conclude, accordingly, that there was a "fair use" of copyrighted material in this case.
 
 IV
 
 48
 We have been asked to examine complex questions concerning the Copyright Act and the memoirs of a public official. Throughout our consideration, we have been guided by our conviction that the statute was not meant to obstruct the citizens' access to vital facts and historical observations about our nation's life. By far the greatest part of the article in The Nation was no more than the reporting of information concerning political decisions at the highest level of government. These facts were sown in and gathered from the shared ground of our country's history. They are the "property of all," Hoehling v. Universal City Studios, Inc., supra, 618 F.2d at 974. The magazine took a meager, indeed an infinitesimal amount of Ford's original language. We do not believe the Act was intended to chill the activities of the press by forbidding a circumscribed use of copyrighted words, as we have indicated.
 
 
 49
 Accordingly, we reverse the finding of copyright infringement and the award of damages and affirm the dismissal of Harper & Row's and Reader's Digest's state law claims.
 
 APPENDIX
 THE FORD MEMOIRS: BEHIND THE NIXON PARDON
 
 50
 In his memoirs, A Time To Heal, which Harper & Row will publish in late May or early June, former President Gerald R. Ford says that the idea of giving a blanket pardon to Richard M. Nixon was raised before Nixon resigned from the Presidency by Gen. Alexander Haig, who was then the White House chief of staff.
 
 
 51
 Ford also writes that, but for a misunderstanding, he might have selected Ronald Reagan as his 1976 running mate, that Washington lawyer Edward Bennett Williams, a Democrat, was his choice for head of the Central Intelligence Agency, that Nixon was the one who first proposed Rockefeller for Vice President, and that he regretted his "cowardice" in allowing Rockefeller to remove himself from Vice Presidential contention. Ford also describes his often prickly relations with Henry Kissinger.
 
 
 52
 The Nation obtained the 655-page typescript before publication. Advance excerpts from the book will appear in Time in mid-April and in The Reader's Digest thereafter. Although the initial print order has not been decided, the figure is tentatively set at 50,000; it could change, depending upon the public reaction to the serialization.
 
 
 53
 Ford's account of the Nixon pardon contains significant new detail on the negotiations and considerations that surrounded it. According to Ford's version, the subject was first broached to him by General Haig on August 1, 1974, a week before Nixon resigned. General Haig revealed that the newly transcribed White House tapes were the equivalent of the "smoking gun" and that Ford should prepare himself to become President.
 
 
 54
 Ford was deeply hurt by Haig's revelation: "Over the past several months Nixon had repeatedly assured me that he was not involved in Watergate, that the evidence would prove his innocence, that the matter would fade from view." Ford had believed him, but he let Haig explain the President's alternatives.
 
 
 55
 He could "ride it out" or he could resign, Haig said. He then listed the different ways Nixon might resign and concluded by pointing out that Nixon could agree to leave in return for an agreement that the new President, Ford, would pardon him. Although Ford said it would be improper for him to make any recommendation, he basically agreed with Haig's assessment and adds, "Because of his references to the pardon authority, I did ask Haig about the extent of a President's pardon power."
 
 
 56
 "It's my understanding from a White House lawyer," Haig replied, "That a President does have authority to grant a pardon even before criminal action has been taken against an individual."
 
 
 57
 But because Ford had neglected to tell Haig he thought the idea of a resignation conditioned on a pardon was improper, his press aide, Bob Hartmann, suggested that Haig might well have returned to the White House and told President Nixon that he had mentioned the idea and Ford seemed comfortable with it. "Silence implies assent."
 
 
 58
 Ford then consulted with White House special counsel James St. Clair, who had no advice one way or the other on the matter more than pointing out that he was not the lawyer who had given Haig the opinion on the pardon. Ford also discussed the matter with Jack Marsh, who felt that the mention of a pardon in this context was a "time bomb," and with Bryce Harlow, who had served six Presidents and who agreed that the mere mention of a pardon "could cause a lot of trouble."
 
 
 59
 As a result of these various conversations, Vice President Ford called Haig and read him a written statement: "I want you to understand that I have no intention of recommending what the President should do about resigning or not resigning and that nothing we talked about yesterday afternoon should be given any consideration in whatever decision the President may wish to make."
 
 
 60
 Despite what Haig had told him about the "smoking gun" tapes, Ford told a Jackson, Mich., luncheon audience later in the day that the President was not guilty of an impeachable offense. "Had I said otherwise at the moment," he writes, "the whole house of cards might have collapsed."
 
 
 61
 In justifying the pardon, Ford goes out of his way to assure the reader that "compassion for Nixon as an individual hadn't prompted my decision at all." Rather, he did it because he had "to get the monkey off my back one way or the other."
 
 
 62
 The precipitating factor in his decision was a series of secret meetings his general counsel, Phil Buchen, held with Watergate Special Prosecutor Leon Jaworski in the Jefferson Hotel, where they were both staying at the time. Ford attributes Jaworski with providing some "crucial" information--i.e., that Nixon was under investigation in ten separate areas, and that the court process could "take years." Ford cites a memorandum from Jaworski's assistant, Henry S. Ruth Jr., as being especially persuasive. Ruth had written:
 
 
 63
 "If you decide to recommend indictment I think it is fair and proper to notify Jack Miller and the White House sufficiently in advance so that pardon action could be taken before the indictment." He went on to say: "One can make a strong argument for leniency and if President Ford is so inclined, I think he ought to do it early rather than late."
 
 
 64
 Ford decided that court proceedings against Nixon might take six years, that Nixon "would not spend time quietly in San Clemente," and "it would be virtually impossible for me to direct public attention on anything else."
 
 
 65
 Buchen, Haig and Henry Kissinger agreed with him. Hartmann was not so sure.
 
 
 66
 Buchen wanted to condition the pardon on Nixon agreeing to settle the question of who would retain custody and control over the tapes and Presidential papers that might be relevant to various Watergate proceedings, but Ford was reluctant to do that.
 
 
 67
 At one point a plan was considered whereby the Presidential materials would be kept in a vault at a Federal facility near San Clemente, but the vault would require two keys to open it. One would be retained by the General Services Administration, the other by Richard Nixon.
 
 
 68
 The White House did, however, want Nixon to make a full confession on the occasion of his pardon or, at a minimum, express true contrition. Ford tells of the negotiation with Jack Miller, Nixon's lawyer, over the wording of Nixon's statement. But as Ford reports Miller's response, Nixon was not likely to yield. "His few meetings with his client had shown him that the former President's ability to discuss Watergate objectively was almost nonexistent."
 
 
 69
 The statement they really wanted was never forthcoming. As soon as Ford's emissary arrived in San Clemente, he was confronted with an ultimatum by Ron Zeigler, Nixon's former press secretary. "Let's get one thing straight immediately," Zeigler said. "President Nixon is not issuing any statement whatsoever regarding Watergate, whether Jerry Ford pardons him or not." Zeigler proposed a draft, which was turned down on the ground that "no statement would be better than that." They went through three more drafts before they agreed on the statement Nixon finally made, which stopped far short of a full confession.
 
 
 70
 When Ford aide Benton Becker tried to explain to Nixon that acceptance of a pardon was an admission of guilt, he felt the President wasn't really listening. Instead, Nixon wanted to talk about the Washington Redskins. And when Becker left, Nixon pressed on him some cuff links and a tiepin "out of my own jewelry box."
 
 
 71
 Ultimately, Ford sums up the philosophy underlying his decision as one he picked up as a student at Yale Law School many years before. "I learned that public policy often took precedence over a rule of law. Although I respected the tenet that no man should be above the law, public policy demanded that I put Nixon--and Watergate--behind us as quickly as possible."
 
 
 72
 Later, when Ford learned that Nixon's phlebitis had acted up and his health was seriously impaired, he debated whether to pay the ailing former President a visit. "If I made the trip it would remind everybody of Watergate and the pardon. If I didn't, people would say I lacked compassion." Ford went:
 
 
 73
 He was stretched out flat on his back. There were tubes in his nose and mouth, and wires led from his arms, chest and legs to machines with orange lights that blinked on and off. His face was ashen, and I thought I had never seen anyone closer to death.
 
 
 74
 The manuscript made available to The Nation includes many references to Henry Kissinger and other personalities who played a major role during the Ford years.
 
 
 75
 On Kissinger. Immediately after being informed by Nixon of his intention to resign, Ford returned to the Executive Office Building and phoned Henry Kissinger to let him know how he felt. "Henry," he said, "I need you. The country needs you. I want you to stay. I'll do everything I can to work with you."
 
 
 76
 "Sir," Kissinger replied, "it is my job to get along with you and not yours to get along with me."
 
 
 77
 "We'll get along," Ford said. "I know we'll get along." Referring to Kissinger's joint jobs as Secretary of State and National Security Adviser to the President, Ford said, "I don't want to make any change. I think it's worked out well, so let's keep it that way."
 
 
 78
 Later Ford did make the change and relieved Kissinger of his responsibilities as National Security Adviser at the same time that he fired James Schlesinger as Secretary of Defense. Shortly thereafter, he reports, Kissinger presented him with a "draft" letter of resignation, which he said Ford could call upon at will if he felt he needed it to quiet dissent from conservatives who objected to Kissinger's role in the firing of Schlesinger.
 
 
 79
 On John Connally. When Ford was informed that Nixon wanted him to replace Agnew, he told the President he had "no ambition to hold office after January 1977." Nixon replied that that was good since his own choice for his running mate in 1976 was John Connally. "He'd be excellent," observed Nixon. Ford says he had "no problem with that."
 
 
 80
 On the Decision to Run Again. Ford was, he tells us, so sincere in his intention not to run again that he thought he would announce it and enhance his credibility in the country and the Congress, as well as keep the promise he had made to his wife, Betty.
 
 
 81
 Kissinger talked him out of it. "You can't do that. It would be disastrous from a foreign policy point of view. For the next two and a half years foreign governments would know that they were dealing with a lame-duck President. All our initiatives would be dead in the water, and I wouldn't be able to implement your foreign policy. It would probably have the same consequences in dealing with the Congress on domestic issues. You can't reassert the authority of the Presidency if you leave yourself hanging out on a dead limb. You've got to be an affirmative President."
 
 
 82
 On David Kennerly, the White House photographer. Schlesinger was arguing with Kissinger and Ford over the appropriate response to the seizure of the Mayaguez. At issue was whether airstrikes against the Cambodians were desirable; Schlesinger was opposed to bombings. Following a lull in the conversation, Ford reports, up spoke the 30-year-old White House photographer, David Kennerly, who had been taking pictures for the last hour.
 
 
 83
 "Has anyone considered," Kennerly asked, "that this might be the act of a local Cambodian commander who has just taken it into his own hands to stop any ship that comes by?" Nobody, apparently, had considered it, but following several seconds of silence, Ford tells us, the view carried the day. "Massive airstrikes would constitute overkill," Ford decided. "It would be far better to have Navy jets from the Coral Sea make surgical strikes against specific targets."
 
 
 84
 On Nixon's Character. Nixon's flaw, according to Ford, was "pride." "A terribly proud man," writes Ford, "he detested weakness in other people. I'd often heard him speak disparagingly of those whom he felt to be soft and expedient. (Curiously, he didn't feel that the press was weak. Reporters, he sensed, were his adversaries. He knew they didn't like him, and he responded with reciprocal disdain.)"
 
 
 85
 Nixon felt disdain for the Democratic leadership of the House, whom he also regarded as weak. According to Ford, "His pride and personal contempt for weakness had overcome his ability to tell the difference between right and wrong," all of which leads Ford to wonder whether Nixon had known in advance about Watergate.
 
 
 86
 On hearing Nixon's resignation speech, which Ford felt lacked an adequate plea for forgiveness, he was persuaded that "Nixon was out of touch with reality."
 
 
 87
 In February of last year, when The Washington Post obtained and printed advance excerpts from H.R. Haldeman's memoir, The Ends of Power, on the eve of its publication by Times Books, The New York Times called The Post 's feat "a second-rate burglary."
 
 
 88
 The Post disagreed, claiming that its coup represented "first-rate enterprise" and arguing that it had burglarized nothing, that publication of the Haldeman memoir came under the Fair Comment doctrine long recognized by the courts, and that "There is a fundamental journalistic principle here--a First Amendment principle that was central to the Pentagon Papers case."
 
 
 89
 In the issue of The Nation dated May 5, 1979, our special Spring Books number, we will discuss some of the ethical problems raised by the issue of disclosure.
 
 MESKILL, Circuit Judge, dissenting:
 
 90
 I share fully the majority's view that the copyright laws should not be used to impede the public's vital access to information and knowledge. However, in its endeavor to reaffirm the important role of a free press in our democracy, the majority fails to articulate clearly the legal principles on which it relies. Because I believe that a more precise legal analysis leads to a different result here, I must respectfully dissent.
 
 
 91
 * The majority concedes that "A Time To Heal" is copyrightable, but refuses to accord it copyright protection because The Nation supposedly took "facts" and not "expression" from the work. The majority tries to ascertain whether the contents of certain passages of the memoirs are themselves copyrightable, even though copyright protection is not given to passages but to a work as a whole.
 
 
 92
 I disagree with the majority's statement that President Ford's description of his state of mind at the time of the Nixon pardon is a fact not entitled to copyright protection. The majority maintains that "states of mind" which play a role in the crucial political decisions of public officials are as much "fact" as any act the official may take. While a person's state of mind is a "fact," his expression of his state of mind is not. Because state of mind is elusive and not susceptible to empirical proof, an author's state of mind is what the author describes it to be. This description may be accurate or a post hoc rationalization or downright false, but it is truly the reflection of the author at the time of writing and is therefore expression entitled to protection.
 
 
 93
 But I will assume arguendo that "states of mind" are fact because the majority opinion has a greater flaw. The opinion concludes that because the passages in question contain "facts," paraphrasing these factually-oriented passages cannot constitute copyright infringement. It thus confines its discussion of copyright infringement to "approximately 300 words that are copyrighted."
 
 
 94
 I do not agree with the majority position that printed facts are never entitled to the protection of the copyright laws. It is no less a copyright infringement to reproduce copyrightable works consisting of "facts" than to reproduce those consisting of "expression." There are many cases which hold that copying of works largely comprised of facts constitutes copyright infringement. See, e.g., Schroeder v. William Morrow & Co., 566 F.2d 3 (7th Cir.1977) (copying of names and addresses of gardening suppliers from plaintiff's listings and descriptions of same held to constitute infringement); Adventures In Good Eating, Inc. v. Best Places To Eat, Inc., 131 F.2d 809 (7th Cir.1942) (infringement to copy restaurant listings); Quinto v. Legal Times of Washington, 506 F.Supp. 554 (D.D.C.1981) (infringement to reprint most of article describing perquisites offered by law firms and containing interviews with summer associates, even though article consisted primarily of facts or data in public domain); Northwestern Bell Telephone Co. v. Bedco of Minnesota, Inc., 501 F.Supp. 299 (D.Minn.1980) (infringement to copy and publish information in telephone directory without independent research). See generally Gorman, Copyright Protection for the Collection and Representation of Facts, 76 Harv.L.Rev. 1569 (1963); 1 M. Nimmer, Nimmer on Copyright Secs. 2.04[B], 2.11[D] (1983). This Court has acknowledged that verbatim copying of a factual work is actionable as copyright infringement. Hoehling v. Universal City Studios, Inc., 618 F.2d 972, 980 (2d Cir.1980), cert. denied, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). Paraphrasing, which is what took place here, is the equivalent of copying for purposes of the copyright laws. See, e.g., Donald v. Zack Meyer's T.V. Sales and Service, 426 F.2d 1027, 1030 (5th Cir.1970), cert. denied, 400 U.S. 992, 91 S.Ct. 459, 27 L.Ed.2d 441 (1971); West Publishing Co. v. Edward Thompson Co., 176 F. 833, 838 (2d Cir.1910); Addison-Wesley Publishing Co. v. Brown, 223 F.Supp. 219, 227-28 (E.D.N.Y.1963).
 
 
 95
 Whether there is a copyright infringement simply turns on whether there has been an unlawful appropriation of copyrightable work. In Meredith Corp. v. Harper & Row, Publishers, Inc., 378 F.Supp. 686 (S.D.N.Y.1974), aff'd, 500 F.2d 1221 (2d Cir.1974) (per curiam), Meredith published a textbook on child development which was merely a rewriting and rearrangement of a Harper & Row text in the same field. The Meredith text was held to infringe on the Harper & Row copyright even though the text contained some independent ideas of the author. Similarly, in Wainwright Securities, Inc. v. Wall Street Transcript Corp., 558 F.2d 91 (2d Cir.1977), cert. denied, 434 U.S. 1014, 98 S.Ct. 730, 54 L.Ed.2d 759 (1978), defendant's abstracts of plaintiff's copyrighted[1] financial reports were held to be copyright infringement.
 
 
 96
 The effect of the above cases is not to provide protection for the facts themselves but for the author's original articulation and presentation of the facts. Copyright laws protect originality. They are meant to safeguard the embodiment in a tangible medium of an author's intellectual labors. See 17 U.S.C. Sec. 102(a) (1982); Higgins v. Keuffel, 140 U.S. 428, 431, 11 S.Ct. 731, 732, 35 L.Ed. 470 (1891). They thus offer protection against a work that is substantially an unoriginal appropriation of the copyrighted work, i.e., "substantially similar." See Warner Bros. Inc. v. American Broadcasting Companies, Inc., 654 F.2d 204, 207-08 (2d Cir.1981) (discussing the "substantially similar" test of copyright infringement). Consequently, while a second author may feel free to use facts that are in the first work, he cannot appropriate expression, method of treatment, emphasis, selection of exact details, or anything else that makes the copyrighted work original. Wainwright, 558 F.2d at 95-96.
 
 
 97
 In the cases relied on by the majority, most notably Hoehling v. Universal City Studios, Inc., 618 F.2d 972 (2d Cir.1980), cert. denied, 449 U.S. 841, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980), and Rosemont Enterprises, Inc. v. Random House, Inc., 366 F.2d 303 (2d Cir.1966), cert. denied, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), the allegedly infringing works were original. In Hoehling, this Court refused to find copyright infringement where the second author relied on the first work for some facts but wrote his own original account, did a great deal of original research and did not copy or paraphrase any part of the book (although he used some of the same literary devices as did the first author). Similarly, in Rosemont, no infringement was found where the second author wrote an original biography, did a substantial amount of original research and copied only a few passages for his 304-page work. These cases are distinguishable from the instant case in which the Nation article, almost entirely a paraphrase, was of trivial originality and contained no independent research by the author. Thus, this case has no similarity to Hoehling and Rosemont; culling language about facts from those cases does not alter the reality that the allegedly infringing works in those cases were original while the Nation article was not.
 
 
 98
 To determine whether the allegedly infringing work appropriates the originality of the protected work, a comparison of both works in their entirety is necessary. Judge Owen's view that the "totality" of the memoirs is protected is not erroneous. Taking into account all of the factors that make a work original, the question of infringement becomes much more a decision to be made on a case-by-case basis than a mechanical determination based on the number of "words that are copyrighted" in the allegedly infringing work. This case-by-case approach is consistent with the prevailing law that determining whether there is "substantial similarity" between two works is a question to be determined by the trier of fact. See, e.g., Ideal Toy Corp. v. Fab-Lu Ltd., 360 F.2d 1021, 1022 (2d Cir.1966).
 
 
 99
 The majority's fear that an affirmance here would "[permit] a public official to take private possession of the most important details of a nation's historical and political life by adding language here and there ...." is unjustified. The Nation was perfectly free to use whatever facts were contained in Ford's memoirs as part of its own original work. What The Nation could not do was compile a work purportedly reporting certain "facts" that did no more than appropriate the same quotes, expressions, selection of language, events, corroboration and recreations that were present in the Ford memoirs and that added nothing original of its own.
 
 
 100
 Thus, The Nation's paraphrasing of parts of the Ford memoirs constitutes copyright infringement under 17 U.S.C. Sec. 501 (1982) unless it falls within the "fair use" exception.
 
 II
 
 101
 The "fair use" exception, now codified at 17 U.S.C. Sec. 107 (1982), allows certain unauthorized uses of copyrighted material without civil liability if those uses advance social, educational or scientific causes. See, e.g., Berlin v. E.C. Publications, Inc., 329 F.2d 541, 544-45 (2d Cir.1964), cert. denied, 379 U.S. 822, 85 S.Ct. 46, 13 L.Ed.2d 33 (1964). The heart of the fair use doctrine is that a secondary use of an original work may be tolerated if the use has social value or is valuable for the information it disseminates. See, e.g., Williams & Wilkins Co. v. United States, 487 F.2d 1345, 203 Ct.Cl. 74 (1973) (large-scale photocopying of medical articles by government research institute and its library), aff'd by an equally divided Court, 420 U.S. 376, 95 S.Ct. 1344, 43 L.Ed.2d 264 (1975) (per curiam); Loew's Inc. v. Columbia Broadcasting System, Inc., 131 F.Supp. 165, 175-76 (S.D.Cal.1955) (discussing the use of extensive quotations in reviewing the fair use doctrine), aff'd sub nom. Benny v. Loew's Inc., 239 F.2d 532 (9th Cir.1956), aff'd by an equally divided Court, 356 U.S. 43, 78 S.Ct. 667, 2 L.Ed.2d 583 (1958) (per curiam). The fair use doctrine strikes the balance between the First Amendment and the Copyright Act, or between "the public interest in the free flow of ideas and information [and] the copyright holder's interest in exclusive proprietary control of his work." Roy Export Company Establishment of Vaduz, Liechtenstein v. Columbia Broadcasting System, Inc., 672 F.2d 1095, 1099 n. 9 (2d Cir.1982),cert. denied, --- U.S. ----, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982). Undoubtedly, the value in ensuring the public's access to knowledge is the reason news reporting exemplifies fair use. Thus, if The Nation's article constituted a dissemination of news it might be protected as a "fair use" of the Ford memoirs.
 
 
 102
 I agree with the majority that the holding below that the Nation article was not news was clearly erroneous. Courts should be chary of deciding what is and what is not news. Certainly there is news value in the fact that a former president of the United States has written a book detailing his state of mind and motivation in pardoning his predecessor. The Nation was free to print an article disclosing that fact and describing the book. Some of the things it might choose to include are the publisher's name, publication date, price and topics covered. The fact that an article covers a newsworthy subject or event, however, does not automatically eliminate the author's rights in his literary property. There are limits to what a news article may legitimately take from a copyrighted work.
 
 
 103
 That the article contains news is only the beginning of the inquiry into whether it constitutes fair use of the copyrighted material. The court must also consider "the amount and substantiality of the portion used in relation to the copyrighted work as a whole." 17 U.S.C. Sec. 107(3) (1982). A news article is only a fair use if it takes what is fair and reasonable for the news story. Otherwise a news publication could with impunity run a story stating that a public figure authored a copyrighted book and then reprint the entire contents of the book. In that situation no one would argue that the newsworthiness of the book would insulate the publisher from civil liability.
 
 
 104
 Keeping in mind that "fair use" is an equitable doctrine, I believe that the Nation article did not constitute a fair use of "A Time To Heal." An article that merely announces the existence of a not-yet-published book and says to the readership, "This is a short abstract of what is in the book," cannot qualify as a fair use. A similar claim of "news reporting as fair use" was rejected in Wainwright:[2]
 
 
 105
 Unlike traditional news coverage ... the Transcript did not provide independent analysis or research; it did not solicit comments on the same topics from other financial analysts; and it did not include any criticism, praise, or other reactions by industry officials or investors.... This was not legitimate coverage of a news event....
 
 
 106
 558 F.2d at 96 (emphasis added).
 
 
 107
 "Legitimate coverage of a news event," id., will thus contain original material. The Nation might have corroborated or contrasted Ford's description of the events with other accounts; it might have focused on other statements by Ford to put the memoirs in context; it might even have included a sketch of why the book was important and what effect the events in the book, which occurred almost a decade ago, had on the nation's history. It could also have compared the Ford memoirs to the known record, which one of defendant's experts said "is the big part of the job of a working journalist...." App. at 369 (testimony of F. Friendly). It did none of these. I do not mean to suggest that any of these are the sine qua non of a news story, but The Nation chose to rely exclusively on the copyrighted Ford memoirs for its story; it added nothing at all original. Rosemont counseled that such "extensive verbatim copying or paraphrasing" could not satisfy the fair use standard. 366 F.2d at 310.
 
 
 108
 The passage describing Ford's impression of Nixon ill in bed is just one illustration of the article's lack of originality and the unreasonableness of its use of the memoirs. The majority believes that this passage is an insubstantial use of the memoirs that gives the rest of the article credibility. I believe that it is blatant infringement, a direct appropriation of some of the most vivid parts of the book.
 
 
 109
 Based on The Nation 's use of no source other than "A Time To Heal" to write its article and on its use of the exact language in the book in many places, I can only conclude that The Nation has used far more of the memoirs than was necessary to write a "news" article. I believe that this conclusion is mandated irrespective of whether the material in the memoirs "concerns matter of great public import." Cf. Iowa State University Research Foundation, Inc. v. American Broadcasting Companies, Inc., 621 F.2d 57, 61 (2d Cir.1980) ("The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance."). We recently rejected the fair use defense when we accepted the trial court's finding that the amount of the original work used was "so substantial as to be unfairly excessive." MCA, Inc. v. Wilson, 677 F.2d 180, 185 (2d Cir.1981). Cf. Berlin v. E.C. Publications, Inc., 329 F.2d at 544 (parody does not constitute fair use if borrowed from original "to a far greater degree than that required if the parody is to 'recall or conjure up' that original"). The majority should follow MCA and reject the fair use defense in this case.
 
 
 110
 Furthermore, the fair use defense is negated by the effect of the Nation article on the market for the memoirs and for the serialization that The Nation knew had been licensed to Time magazine. Unlike the majority, I believe that this case involves the "chiseling for personal profit" that we found in Wainwright. 558 F.2d at 97. The Nation is a for-profit magazine trying to sell copies and bolster its own prestige. The publisher hoped that the article would sell newsstand copies and generate renewal subscriptions. Although The Nation's newsstand profit was small, it was still profit. The degree of success is irrelevant. The abstract of the Wainwright reports by itself probably did not make a great profit for the Wall Street Transcript either. Cf. Iowa State University Research Foundation, Inc., 621 F.2d at 61 (that use is for "commercial exploitation" is relevant to, though not determinative of, fair use question) (citing Meeropol v. Nizer, 560 F.2d 1061 (2d Cir.1977), cert. denied, 434 U.S. 1013, 98 S.Ct. 727, 54 L.Ed.2d 756 (1978)).
 
 
 111
 Fair use will generally not be found if there has been a substantial incursion into the market for the primary work. See, e.g., Meredith Corp. v. Harper & Row, Publishers, Inc., 378 F.Supp. 686, 689 (S.D.N.Y.1974), aff'd, 500 F.2d 1221 (2d Cir.1974). It is evident that The Nation knowingly invaded the market for the Time serialization. Some who read the Nation article probably refrained from buying the memoirs or the properly licensed Time serialization. Time cancelled the second payment to Harper & Row because of the Nation article. Irrespective of its stated purpose, The Nation knew that it was fulfilling the demand for the Time excerpts. The Nation thus printed rewritten portions of the copyrighted Ford memoirs without paying for the privilege. Cf. DC Comics Inc. v. Reel Fantasy, Inc., 696 F.2d 24, 28 (2d Cir.1982) (denying fair use defense even though district court found no harm resulted from use defendant did not pay for on ground that licensing for a fee is a benefit of owning a copyright). Fair use should not be found here.
 
 
 112
 The majority is correct in suggesting that the fair use doctrine is used to reconcile competing claims of freedom of the press and ownership of intellectual labor. But the result reached by Judge Owen does not "threaten press freedom or obstruct the citizens' access to vital facts and historical observations about the nation's life." The publication of the book itself and the other authorized uses of the copyrighted material would satisfy that need. An affirmance would only chill chiseling for personal profit. I would affirm.
 
 
 
 [1]
 Appellees' later motion to plead a further amended and/or supplemental complaint was denied on the same ground
 
 
 [2]
 In their brief before this Court, cross-appellants curiously include a claim for "injury to the confidential manner in which publishers solicit sales of pre-publication serialization rights" among those dismissed by the district court. That claim was dropped from cross-appellants' complaint by their own amendment, and so was not before the lower court when it ruled on the dismissal motion. It is also not raised as an issue on appeal
 
 
 [3]
 The Copyright Act, 17 U.S.C. Sec. 301, states in pertinent part:
 (a) On and after January 1, 1978, all legal or equitable rights that are equivalent to any of the exclusive rights within the general scope of copyright as specified by section 106 in works of authorship that are fixed in a tangible medium of expression and come within the subject matter of copyright as specified by section 102 and 103, whether created before or after that date and whether published or unpublished, are governed exclusively by this title. Thereafter, no person is entitled to any such right or equivalent right in any such work under the common law or statutes of any State.
 (b) Nothing in this title annuls or limits any rights or remedies under the common law or statutes of any State with respect to--
 * * *
 (3) activities violating legal or equitable rights that are not equivalent to any of the exclusive rights within the general scope of copyright as specified by Section 106.
 
 
 [4]
 The Copyright Act, 17 U.S.C. Sec. 106, states as follows:
 Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
 (1) to reproduce the copyrighted work in copies or phonorecords;
 (2) to prepare derivative works based upon the copyrighted work;
 (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
 (4) in the case of literary, musical, dramatic, or choreographic works, pantomimes, and motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
 (5) in the case of literary, musical, dramatic, or choreographic works, pantomimes, and pictorial, graphic, or sculptural works, including the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.
 
 
 [5]
 Interference with the personal property of another which does not rise to the level of conversion may constitute the lesser tort of trespass to chattels. See Restatement (Second) of Torts Secs. 216-222 (1965). Cross-appellants at one point hinted at such a claim. After Judge Owen dismissed the state law counts in their complaint, they sought permission to make a second amendment adding claims of, inter alia, "trespassing upon plaintiffs' rights to its business documents...." See note 1, supra. Their motion to amend was denied, and the issue has not been raised here. Cross-appellants could not succeed on this claim in any event, since liability for trespass to chattels exists only upon a showing of actual damage to the property interfered with. F. Harper & F. James, supra, Sec. 2.3
 
 
 [6]
 This section reads in pertinent part:
 Sec. 102. Subject matter of copyright: In general
 (a) Copyright protection subsists, in accordance with this title, in original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device. Works of authorship include the following categories:
 (1) literary works;
 * * *
 
 
 [7]
 17 U.S.C. Sec. 102(b) reads:
 In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such work.
 One reasonable interpretation of the word "discovery" in the statute is "fact." For example, an historian who learns in his research that a certain event occurred has discovered a fact. See 1 Nimmer on Copyright Sec. 2.11[A], at 2-157 (1983). The Congressional intent to ensure a free communication of facts and information is explicitly addressed in the House Report which states: "Copyright does not preclude others from using the ideas or information revealed by the author's work." H.R.Rep. No. 1476, 94th Cong., 2d Sess. 56, reprinted in 1976 U.S.Code Cong. & Ad.News 5656, 5670.
 
 
 [8]
 Our brother Meskill, in dissent, takes issue with our discussion of the copyrightability of facts. The comments in the dissenting opinion, however, indicate a confusion between the copyrightability accorded to "compilations" of facts, with which we do not take issue, and the copyrightability of the "preexisting material" or facts making up those compilations. 17 U.S.C. Sec. 103. Each of the cases on which our dissenting brother relies involves a listing of names, nouns, or information. Those listings, qua lists, are indisputably copyrightable as compilations, and nothing in our opinion asserts the contrary. But the preexisting facts contained within those lists are not protected. In short, while acknowledging elsewhere that the effect of the cited "cases is not to provide protection for the facts themselves but for the author's original articulation and presentation," the dissent nevertheless seems to fail to distinguish the protected whole (the "compilation") from its unprotected parts (the "preexisting material"). The result is the inappropriate application of authorities concerning fact compilations to this case involving a literary work which is predominantly factual in nature, as are histories and biographies
 As discussed, infra, this confusion, in the dissenting opinion, concerning the copyrightability of facts created further misunderstanding concerning paraphrasing of verbatim language in the dissenting opinion.
 
 
 [9]
 We say "some" and not "all" because some of Ford's verbatim language consists of statements or conversations of other persons. As we discuss, infra, such material is not copyrightable by Ford
 
 
 [10]
 In Donald v. Zack Meyer's T.V. Sales & Service, 426 F.2d 1027, 1030 (5th Cir.1970), for example, a printed legal "Agreement" was apparently taken from a form book and only slightly reworded. In Meredith Corp. v. Harper & Row, Publishers, Inc., 378 F.Supp. 686 (S.D.N.Y.1974), aff'd, 500 F.2d 1221 (2d Cir.1974), Meredith took an entire textbook and proceeded to "rewrite" it in minor ways to produce another text
 
 
 [11]
 Nimmer points to a line of cases which have held otherwise on the basis that the author's labor, rather than his writings, are protected by the Copyright Act. 1 Nimmer on Copyright Sec. 2.11[E] at 2-166 (1982). The Second Circuit, however, has explicitly repudiated these authorities and that reasoning in Hoehling v. Universal City Studios, Inc., supra, 618 F.2d at 979
 
 
 [12]
 A comment by Professor Nimmer is particularly relevant to this case. He states: "While freedom of speech generally is not impermissibly abridged by copyright protection for 'expression,' to grant a copyright monopoly to facts as such would constitute an intolerable limitation on First Amendment rights. Would anyone seriously suggest that the Washington Post was deserving of a copyright on the facts of the Watergate incident because its reporters, Woodward & Bernstein, through considerable labor, expense and ingenuity, discovered such facts?" 1 Nimmer on Copyright Sec. 2.11[E] at 2-167 (1982)
 
 
 [13]
 The opinion is not explicit about the precise "revelations" to which it is referring. The court had adopted Plaintiffs' Proposed Findings of Fact and Conclusions of Law as its own Supplemental Findings of Fact after excising certain paragraphs, but a list of examples of Ford's "subjective feelings" was one of those portions which was crossed off. Judge Owen's handwritten amendment to these findings, which states: "The fact that certain proposed findings herein are excised does not mean that the Court finds that the record does not support them....", does not answer the inquiry whether those instances were the "reflections" to which the court then referred in its opinion. We will surmise that, at the least, Ford's statements concerning the effects on the pardon decision of his compassion for Nixon, and his philosophy from Yale Law School are included. His mention of "hurt" upon learning that Nixon had not told him the truth may also be such a revelation
 
 
 [14]
 Judge Meskill calls into question our comment concerning "states of mind" as facts. If he means by his statements that a man owns his own state of mind until he writes it down, we agree. If he means that a man owns the "expression" of his state of mind (e.g., the verbatim language), we are also in agreement. If he means, however, that the state of mind itself, when expressed in different words, may not be written down by another without a copyright infringement having occurred, we respectfully disagree for reasons stated in our discussion of the copyrightability of facts and of paraphrase
 
 
 [15]
 The dissent attempts to distinguish away our reliance on Hoehling, supra, by pointing out that the alleged infringer in that case added something original to the historical or biographical information taken. Regardless of the accuracy of this observation, it has nothing to do with the question of the copyrightability of the work from which the facts were gleaned. If any consideration of the originality of The Nation article is appropriate, and we do not suggest that it is, such observations belong to the discussion of "fair use" of copyrighted material, not to the discussion of whether the historical and political facts described in A Time To Heal were copyrightable
 
 
 [16]
 17 U.S.C. Sec. 105 states: "Copyright protection under this title is not available for any work of the United States Government...." 17 U.S.C. Sec. 101 defines a "work of the United States Government" as "a work prepared by an officer or employee of the United States Government as part of that person's official duties."
 We need not decide here whether Sec. 105 or its predecessor, the former Sec. 8, controls the Hungate Committee material. Under either section, this printed work would not be copyrightable. See H.R.Rep. No. 1476, 94th Cong., 2d Sess. 58 (1976).
 
 
 [17]
 See supra n. 6
 
 
 [18]
 This section of the statute states:
 Sec. 107. Limitations on exclusive rights: Fair use
 Notwithstanding the provisions of section 106, the fair use of a copyrighted work, including such use by reproduction in copies or phonorecords or by any other means specified by that section, for purposes such as criticism, comment, news reporting, teaching (including multiple copies for classroom use), scholarship, or research, is not an infringement of copyright. In determining whether use made of a work in a particular case is a fair use the factors to be considered shall include--
 (1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;
 (2) the nature of the copyrighted work;
 (3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and
 (4) the effect of the use on the potential market for or value of the copyrighted work.
 
 
 [19]
 The dissenting opinion's reliance on Wainwright Securities, Inc. v. Wall Street Transcript Corp., supra, is inapposite. The infringer in that case, the Wall Street Transcript, made use of Wainwright's "financial analyses and prediction." It did not simply report scientific, historical, or financial facts in its own words. In addition, the Transcript's repeated printing of Wainwright's financial analyses differs significantly from The Nation 's one-time use
 
 
 [20]
 We have also explicitly rejected that approach in relation to copyrightability. See note 11, supra
 
 
 [21]
 The use by The Nation of no more than 300 copyrighted words from a book of approximately 200,000 is not such a "bodily appropriation," id., as would call for an exception to this statement or militate against a finding of "fair use."
 
 
 [1]
 The term "copyrighted," as used in this dissent, assumes that the copyright is valid
 
 
 [2]
 In Wainwright, we held that defendant's abstracts of plaintiff's financial reports did not constitute a fair use partly because the abstracts were not "legitimate" news reports and partly because they had the "obvious intent ... of fulfilling the demand for the original work ... [and constituted] chiseling for personal profit." 558 F.2d at 96-97