**Parviz C. RADJI, Plaintiff,**

v.

**Javad KHAKBAZ, et al., Defendants.**

**Civ. A. No. 84–0641.**

United States District Court,
District of Columbia.

April 30, 1985.

Claudia Ribet, Grove, Engelberg & Gross, Washington, D.C., Sheldon Bardach, Los Angeles, Cal., for plaintiff.

William A. Dobrovir, Dobrovir & Gebhardt, Washington, D.C., for defendants.

## MEMORANDUM ORDER

HAROLD H. GREENE, District Judge.

Parviz C. Radji, the last Ambassador to Great Britain for the government of the late Shah of Iran brought this copyright infringement action against the Iran Times Corporation and Javad Khakbaz, the sole owner and editor of the *Iran Times*, a newspaper printed in English and Farsi which is published here in the District of Columbia and distributed throughout the United States, Canada, and various other countries. Plaintiff alleges that defendants copied and translated substantial excerpts from his book entitled *In the Service of the Peacock Throne*, which were published in the *Sunday Times* of London, and that they reprinted these excerpts in the *Iran Times* without plaintiff's permission and without compensating him. The parties have filed cross-motions for summary judgment on the issue of liability. For the reasons stated below, plaintiff's motion will be granted and defendants' motion will be denied.

I

There are no genuine issues of material fact. While plaintiff was serving as the Shah's Ambassador to Great Britain, *i.e.*, from June 4, 1976 to January 26, 1979, he kept a daily diary of his experiences. In January of 1983, he published these diaries under the title *In the Service of the Peacock Throne*. The book was registered on January 14, 1983, under the copyright laws of the United Kingdom, and it was later registered with the United States Register of Copyrights.[1]

1. Plaintiff first registered his book in the United States on January 10, 1984. However, the book registered here was slightly different from the book which was first published in Great Britain and upon which this lawsuit is based. It appears that shortly after his book was published in Great Britain, plaintiff was sued for libel by Afshar, a former minister of the Shah's regime, over approximately 20 sentences in the book. In order to settle this libel action, plaintiff agreed to remove the allegedly libelous edition from the market. In March or April of 1983, a second printing of plaintiff's book which deleted the allegedly libelous material and inserted some new, additional material was distributed.

In January and February of 1983, the *Sunday Times* ran a series of three articles consisting of verbatim excerpts from plaintiff's book. These excerpts comprised over eighty days of daily entries from plaintiff's diary (approximately ten percent of the book) and covered nine pages of newspaper text. In exchange for the exclusive right to publish these excerpts, the *Sunday Times* paid plaintiff 15,000 pounds. The articles also acknowledged and identified plaintiff as the owner of the copyright.

After reading the *Sunday Times* articles, defendants decided that the excerpts from plaintiff's book would also be of interest to the readers of the *Iran Times*. Although defendant Khakbaz called the *Sunday Times* in order to secure permission from plaintiff to reprint the articles,[2] he never received such permission either from that newspaper or from the plaintiff. Nevertheless, defendants proceeded to copy 86 percent of the excerpts from plaintiff's book quoted in the *Sunday Times* articles, translated them into Farsi, and reprinted them in a series of articles in 12 separate editions of the *Iran Times*.[3]

Upon learning of these articles, plaintiff demanded that defendants cease any further publications, and he thereafter filed this lawsuit. See note 6, *infra*.

## II

There are essentially two elements in a copyright infringement action: ownership of the copyright by the plaintiff, and copying by the defendant. 3 *Nimmer on Copyright* § 13.01 at 13–3 (1984). Defendants here concede that plaintiff owns the copyright in the book and that they copied and translated verbatim excerpts from plaintiff's book reprinted in the *Sunday Times*, so that they could reprint them in their own newspaper, the *Iran Times*.[4] Notwithstanding these concessions, defendants maintain that their copying is not actionable under the Copyright Act because (1) the similarity between the works is insubstantial; and (2) the use of passages from plaintiff's book constituted fair use.[5] Neither point has merit.[6]

## III

Defendants' argument relating to substantial similarity and appropriation of ex-

It was this second printing that was registered in the United States in January of 1984.

On the basis of the slight differences between the two printings, which both parties agree are not substantively relevant to this lawsuit, defendants moved to dismiss the action on the ground that plaintiff failed to comply with 17 U.S.C. § 411(a) (which provides that the registration of a work is a prerequisite to maintaining an infringement action). The Court, however, need not decide this issue since shortly before oral argument on the parties' motions, plaintiff cured whatever technical defect there was by depositing and registering the first printing of his book with the United States Copyright Office.

**2.** Khakbaz deposition at 32–33.

**3.** Defendants' first article appeared on January 28, 1983. This article contained an English version as well as Farsi translations of excerpts from plaintiff's book.

**4.** The fact that defendants copied the material from the *Sunday Times* articles rather than from plaintiff's book directly is irrelevant. The Copyright Act gives the owner of the copyright the exclusive right to distribute copies of the

copyrighted work to the public by sale or other transfer of ownership. Thus, plaintiff has the exclusive right to control publication of his book. 17 U.S.C. § 106(3). See generally, 2 *Nimmer on Copyright* § 8–11 at 8–115.

**5.** The Court considers defendants' additional argument—that they did not copy plaintiff's expression but only reported historical and biographical facts—under the fair use rubric.

**6.** Equally without merit are defendants' affirmative defenses of laches and estoppel. Defendants published the infringing articles in editions dating from January 28, 1983 through April 15, 1983. Approximately one month after the last article was published, defendants received a letter from plaintiff's attorney demanding that they "cease and desist" from publishing any additional excerpts from plaintiff's book. Plaintiff filed suit on March 1, 1984. The Court finds that plaintiff diligently pursued his rights. In any event, defendants were not prejudiced by the short delay in bringing this suit. Defendants have admitted that they knew that the work was copyrighted, that plaintiff owned the copyright; and that, despite the lack of consent, they decided to reprint excerpts from plaintiff's book.

pression is premised upon the erroneous assumption that because they translated portions of plaintiff's book from English to Farsi, and because the Court does not read or understand Farsi, plaintiff has failed to provide a basis upon which the Court could determine whether the *Iran Times* articles were substantially similar to the excerpts from plaintiff's book and whether defendants copied plaintiff's protected expression.

■ The Court need not be fluent in Farsi to find that defendants have infringed plaintiff's copyright where, as here, they have admitted that the *Iran Times* articles were composed entirely of translated quoted passages from plaintiff's book reprinted in the *Sunday Times*.[7] A translation, by definition, uses different language than that in the original. That, however, does not exempt translations from the provisions of the Copyright Act. To the contrary, the Act gives the copyright holder the exclusive right to prepare derivative works, which includes the right to make translations. 17 U.S.C. § 106(2).[8] Thus, in the absence of authorization, only the plaintiff had the right to translate and reprint his book into Farsi.

## IV

■ The fair use doctrine, now embodied in section 107 of the Copyright Act, permits the limited use of copyrighted material, without the author's consent for purposes "such as criticism, comment, news reporting, teaching ..., scholarship, or research ..." In determining whether a particular use is fair, the Court must consider the following four factors:

(1) the purpose and character of the use, including whether such use is of a commercial nature or is for nonprofit educational purposes;

(2) the nature of the copyrighted work;

(3) the amount and substantiality of the portion used in relation to the copyrighted work as a whole; and

(4) the effect of the use on the potential market for or value of the copyrighted work.

17 U.S.C. § 107. After considering these factors in the context of this case, the Court concludes that defendants' copying cannot be considered fair use.

■ First. Defendants' reprinting of the 80 days of diary entries in a commercial publication was presumably intended to boost sales and thus was for commercial rather than non-profit educational purposes. To be sure, defendants regarded plaintiff's book as newsworthy, and they reprinted the excerpts because they thought it would be of interest to their readership. However, an argument of newsworthiness can always be made where the author of the original work is a well-known person or where the book or article describes political or other events of significance, but that is not *per se* a defense to an infringement action.

■ To be sure, newsworthy items may be entitled to less protection than purely fictional works,[9] but the "expression" of such works is still protected from wholesale copying. See also, pp. 1301–1302, *infra*.

■ Because the fair use doctrine presupposes that defendants acted in good faith, the propriety of their conduct must also be weighed in analyzing the purpose and character of the use. *Marcus v. Row-*

---

**7.** Deposition of Khakbaz at 96–97. Defendants not only borrowed virtually the entire portion of plaintiff's book reprinted in the *Sunday Times;* they also copied the daily diary format used in plaintiff's book and the *Sunday Times* articles.

**8.** A "derivative work" is defined as "a work based upon one or more existing works, such as a translation...." 17 U.S.C. § 101.

**9.** See *Harper & Row Publishers, Inc. v. Nation Enterprises,* 723 F.2d 195, 204 (2d Cir.1983),

cert. granted, —— U.S. ——, 104 S.Ct. 2655, 81 L.Ed.2d 362 (1984). See also *Quinto v. Legal Times of Washington, Inc.,* 506 F.Supp. 554, 560 (D.C.C.1981) ("The fair use doctrine is not a license for corporate theft, empowering a court to ignore a copyright whenever it determines the underlying work contains material of possible public importance," *quoting Iowa State University Research Foundation, Inc. v. American Broadcasting Co.,* 621 F.2d 57, 61 (2d Cir.1980).

*ley*, 695 F.2d 1171, 1175–76 (9th Cir.1983). Here, defendants state that they knew the material in question was copyrighted and that permission from the copyright holder was needed; yet they decided to copy the article anyway. This fact further undercuts their reliance on the first element of the fair use doctrine.

■ Second. Plaintiff's book is in essence a diary, a introspective and highly subjective account of his experiences as the Shah's Ambassador to Great Britain during the two and one-half years immediately preceding the overthrow of the Shah's government.[10] To be sure, many entries in plaintiff's book contain factual and historical information which is not copyrightable, but the expression of that information is, particularly in a case such as this where the expression of those facts is highly anecdotal.[11] Thus, while defendants were free to recount historical and biographical facts described in plaintiff's book, or to comment thereon,[12] they could do so only in their own words—they could not expropriate plaintiff's expression.[13]

The case of *Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195 (2d Cir.1983), *cert. granted*, —— U.S. ——, 104 S.Ct. 2655, 81 L.Ed.2d 362 (1984), upon which defendants rely heavily, is not to the contrary. In that case, Harper & Row, the publisher of former President Ford's memoirs, sued *The Nation* magazine for copyright infringement for its use of materials contained in Ford's memoirs, particularly that information relating to the pardon of former President Nixon. The Second Circuit, reversing the decision of the District Court, held that *The Nation's* use of such material constituted fair use. The court made it plain that it ruled as it did because *The Nation* merely drew upon scattered parts of Ford's memoirs,[14] noting specifically that

> If *The Nation* had taken ... all of the book or all of a chapter and merely changed the language here and there, paraphrasing would not and should not suffice to protect it.

723 F.2d at 203.

Moreover, although the memoirs of former President Ford also contained informa-

---

**10.** For example, plaintiff wrote on April 29, 1977, that:

> I am filled with self-reproach, bordering on disgust, for my half-hearted, unconvincing, totally wet defense of Iran's human rights record at the House of Commons. I have been arrogant enough to think that my personal honesty and credibility are more important than the instructions I am given by Tehran. I must present the official line, whether I find it convincing or not, and it is stupid and pretentious of me to try single-handedly to change the rules. I haven't received a single word or letter praising my defense of Iran. It must have been a pathetic performance.

*Sunday Times* (January 23, 1983) at 34. Exhibit 2 to plaintiff's memorandum.

**11.** Thus, plaintiff writes that

> Mrs. Thatcher and her husband Denis come to dinner at the embassy. Mrs. Thatcher asks about Iran's oil figures and shows herself informed and interested on the subject. Both husband and wife strike me as very pleasant, but I notice that every time Mr. Thatcher tries to say something she interrupts him to say: "But *dahling*, the ambassador already *knows* that."

*Id.* at 33.

**12.** If defendants had reprinted these excerpts for purposes of criticism or review, they would

have been permitted to quote substantial passages because a review merely supplements but does not replace the function of the work being reviewed. That, however, was not the defendants' purpose. Rather, they copied those passages of plaintiff's book which were reprinted in the *Sunday Times* for noncritical purposes. Thus, the *Iran Times* articles did not perform a different function than the book. See 3 *Nimmer on Copyright* § 13.05[B] at 13–81 to 13–82.

**13.** Courts have tolerated more extensive paraphrasing and greater use of works of news or history, confining the concept of the author's "expression" to its barest elements. See *Harper & Row Publishers, Inc. v. Nation Enterprises*, 723 F.2d 195, 204 (2d Cir.1983). None, however, has gone so far as to negate the principle that

> Copyright protects the author's manner of expression, his analysis or interpretation of events, the way he structures his material and marshals facts, his choice of words, and the emphasis he gives to particular developments.

*Quinto, supra*, 506 F.Supp. at 560.

**14.** *The Nation* took only "scattered pieces of information from different pages and different chapters, and then described that information in its own words." 723 F.2d at 203.

tion concerning private aspects of his life and his personal reflections, the court found that "[a]ll the information contained in [*The Nation*] article dealt with Ford's public and political life." 723 F.2d at 199.[15] By contrast, the defendants here made no attempt to ferret out the newsworthy or historical facts in plaintiff's book; they simply copied virtually all the excerpts appearing in the *Sunday Times*, historical and personal alike.

It is finally worthy of note that much of the information in *The Nation* article concerning the Nixon pardon had already been presented by President Ford during a 1974 Congressional committee investigation and printed in government documents. 723 F.2d at 198, 205. There is no evidence in this case that the biographical and other personal information contained in plaintiff's book was otherwise available to the public.[16]

 Third. The *Iran Times* articles at issue consisted entirely of excerpts from plaintiff's book which were reprinted in the *Sunday Times*. Although these excerpts amounted to a little less than ten percent of plaintiff's book, they represented 86 percent of the *Sunday Times* articles—the only portions of plaintiff's book to which the defendants had access. Moreover, defendants' copying of the authorized articles was virtually complete in that all defendants did was to translate them into Farsi. The Court finds that both the quantity[17] and the quality of this copying was substantial.[18]

 Fourth. Where, as ·here, the use of the copyrighted work is for commercial gain, the likelihood of harm to the potential market for or the value of the copyrighted work is presumed. *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984). The defendants' publication of excerpts from plaintiff's book may have adversely affected the potential market in two ways.[19]

In the first place, as indicated above, plaintiff published his book in English in January 1983, and in article form, likewise in English, in the *Sunday Times* in January and February of the same year. Plaintiff translated his book into Farsi in late 1983.[20] By that time defendants' articles had already been circulated in Farsi in marketplaces where plaintiff wished to sell his book, and this was bound to injure substantially many of the same marketplace sales of plaintiff's own Farsi version.[21] More-

---

**15.** In fact, the article largely concerned the events leading up to Ford's decision to pardon Nixon—"political events of major significance." 723 F.2d at 204.

**16.** It is also interesting to note that the Ford memoirs were written with the assistance of a professional writer who gathered information from a variety of sources, including interviews with Alexander Haig, Nelson Rockefeller, and Henry Kissinger. And it was the professional writer, not Ford, who wrote the first draft of the book. These facts further support the Court of Appeals' finding that the memoirs contained, in large part, historical and newsworthy factual information.

**17.** Defendants' argument that the amount copied was insubstantial because the infringing material amounted to only 2.6% of the *Iran Times* editions in question (*i.e.*, 6 pages in 12 editions with a total of 230 pages) is frivolous. It obviously does not matter, in law, what proportion of a particular publication consists of bootleg material; what is significant is how much of a copyrighted article or book is being reprinted.

**18.** See *Roy Export Co. Establishment v. CBS, Inc.*, 503 F.Supp. 1137, 1145 (S.D.N.Y.1980), *aff'd*, 672 F.2d 1095 (2d Cir.1982).

**19.** Contrary to defendants' assertion, plaintiff does not have to establish *actual* harm to the potential market as "such a requirement would leave the copyright holder with no defense against predictable damage. Nor is it necessary to show with certainty that future harm will result." *Sony Corp. v. Universal City Studios*, 464 U.S. 417, 104 S.Ct. 774, 793, 78 L.Ed.2d 574 (1984).

**20.** His Farsi version was published by Ithaca Press in London and distributed in Great Britain and the United States.

**21.** Defendants argue that their articles may have actually improved the market for plaintiff's book by generating interest among their readers—a natural audience for plaintiff's book. Plaintiff, on the other hand, claims that because defendants' Farsi translation was not as good as his own, some Farsi readers may have decided

over, defendants' publication may have precluded plaintiff from selling those portions of his book for which the *Sunday Times* paid 15,000 pounds to another publication, if not to defendants themselves.[22]

The fair use doctrine is based on the concept of reasonableness. *Sony Corp., supra,* 104 S.Ct. at 792 n. 31. A virtual wholesale lifting of extensive excerpts from plaintiff's book quoted in another authorized serialization cannot be considered reasonable as a matter of law. See *Quinto, supra,* 506 F.Supp. at 560, and cases cited therein.

Accordingly, it is this 30th day of April, 1985

ORDERED that defendants' motion for summary judgment be and it is hereby denied; and it is further

ORDERED that plaintiff's motion for summary judgment on the issue of liability be and it is hereby granted; and it is further

ORDERED that a trial on the sole issue of damages shall be held on June 4, 1985 at 10:00 a.m. in Courtroom No. 1.

not to buy the book on the basis of defendants' articles. In any event, even if defendants are right and their articles did not prejudice sales of plaintiff's book, they certainly prejudiced the sale of a serialization of his book in Farsi in a different magazine or newspaper.

**22.** As in the case of *Quinto,* defendants' publication may have been the entire market for a Farsi serialization of plaintiff's work.