TRADESCAPE.COM, Plaintiff,

v.

Sunil SHIVARAM, Andover Brokerage, LLC, Saddle Brook Information Services, Inc. and William Meyers, Defendants.

No. 99 Civ. 8990(LAK).

United States District Court, S.D. New York.

Dec. 3, 1999.

As Amended Dec. 7, 1999.

Michael Carlinsky, Robert Whitman, Rene Kathawala, Orrick, Herrington & Sutcliffe, New York City, for Plaintiff.

Catherine M. McGrath, Nancy J. Mertzel, Louis Greco, Brown, Raysman, Millstein, Felder & Steiner, New York City, for Defendants.

## MEMORANDUM OPINION

KAPLAN, District Judge.

Plaintiff Tradescape.com ("Tradescape") is a securities broker/dealer that runs a day trading operation, permitting customers to make online stock purchases and sales using Tradescape's software and computer system. Defendant Sunil Shivaram worked for Tradescape as a software development consultant from October 1998 until July 1999, when he left to form his own day trading business. Along with defendant William Meyers, Shivaram claims that he developed Bulldog, a computer software program that, like Tradescape's program, allows for online day trading. Defendants Andover Brokerage LLC ("Andover") and Saddle Brook Information Services ("Saddle Brook") allegedly were involved in the development and/or marketing of Bulldog.

On August 18, 1999, Tradescape brought this action, claiming that defendants' Bulldog program is the product of infringement of Tradescape's copyrights and theft of its trade secrets. It sought a temporary restraining order and preliminary injunction restraining defendants from further developing and marketing Bulldog or any other software based on Tradescape's trade secrets or allegedly copyrighted programs and from soliciting Tradescape's customers and employees. The temporary restraining order was granted on August 23, 1999 with a carve-out permitting defendants to continue to develop a copy of the Bulldog software. It was extended on August 25 and again on September 8, in each case on consent. Following extensive evidentiary submissions by both parties,[1] the Court heard oral argument on the preliminary injunction motion on September 23, 1999. The parties then agreed to an extension of the temporary restraining order pending the Court's decision.

In conferences subsequent to the hearing, defendants stated that they intended to abandon the development and marketing of Bulldog and that the case would be settled soon. However, as far as this Court is aware, settlement talks have proved fruitless. Therefore, as no consent injunction has been tendered, the Court is deciding the motion for a preliminary injunction.[2] This memorandum contains the Court's findings of fact and conclusions of law.

### Discussion

In order to obtain a preliminary injunction, the movant must show "(a) irreparable harm, and (b) either (1) a likelihood of success on the merits, or (2) sufficiently serious questions going to the merits to make them fair grounds for litigation and a balance of hardships tipping decidedly in its favor."[3]

### Irreparable Injury

The requirement of immediate and irreparable injury is readily satisfied in this case. Copyright infringement is presumed to give rise to such harm.[4] The same usually can be said of misappropria-

---

1. On August 27, 1999, Andover entered into a consent order agreeing to the terms of the temporary restraining order pending resolution of the action. The consent order stipulates that it will dissolve if the Court denies the preliminary injunction.

2. Voluntary cessation of unlawful conduct alone does not moot an application for an injunction. *See United States v. W.T. Grant Co.,* 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303 (1953).

3. *See, e.g., Richard Feiner & Co. v. Turner Ent. Co., MGM/UA,* 98 F.3d 33, 34 (2d Cir.1996) (citing *inter alia Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir. 1979) (per curiam)).

4. *Fisher–Price, Inc. v. Well–Made Toy Mfg. Corp.,* 25 F.3d 119, 124 (2d Cir.1994).

tion of trade secrets. Moreover, assuming plaintiff is correct on the merits, the extent of the harm suffered by plaintiff could not readily be measured, suggesting that the injury would be truly irreparable. Defendants conceded as much at oral argument.[5]

*Balance of Hardships*

That plaintiff is threatened with irreparable harm does not necessarily mean that the balance of hardships also tips in plaintiff's favor. While the irreparable harm inquiry focuses on whether, assuming eventual success on the merits, plaintiff would be injured irreparably if the injunction did not issue, the balance of hardships inquiry asks which of the two parties would suffer most grievously if the preliminary injunction motion were wrongly decided.[6]

In this case, the risk to defendants of an erroneous injunction, although potentially significant, is uncertain. An injunction may delay defendants in bringing Bulldog to market. Such a delay could prove costly, particularly in times of rapid technological change such as these, in which software can become outdated quickly. However, any prediction of harm resulting from such a delay would be speculative, as Bulldog's successful completion and market acceptance are not predictable.

Further, it is not clear that continuation of the injunction with a carve-out permitting continued development and beta-testing in the interim really would delay defendants [7] and, if so, by how much. There are conflicting accounts as to when Bulldog will be ready to go to market. Even assuming that Bulldog is close to being finished, it is common knowledge that software often runs into time consuming and sometimes fatal problems in the beta-test-

ing phase. Given the inherent speculativeness of the development and marketing time-line, erroneous issuance of a preliminary injunction perhaps would not harm defendants at all, particularly inasmuch as the plenary trial is set for January 4, 2000, subject to the other demands of the Court's docket and the actual urgency of an immediate trial given defendants' possible abandonment of Bulldog.

In contrast, the risks to plaintiff of wrongful denial of an injunction are more serious. Just as defendants risk a costly delay in coming to market were an injunction wrongly issued, plaintiff risks losing revenue to defendants were an injunction wrongfully denied. Just as is true for defendants, such a hardship is potentially significant, yet uncertain, as Bulldog's completion and market success are hard to predict. Plaintiff faces additional risks, however. Not only would plaintiff lose revenue to defendants in the interim period, but some customers lost to defendants pending a final decision might not return to plaintiff even if defendants ultimately were enjoined. Further, if defendants were not enjoined, plaintiff would risk broader dissemination of its trade secrets during the pendency of this litigation.

The resulting damages could not easily be quantified. While plaintiff's short-term loss of revenue to defendants could be calculated readily and compensated, long-term damage to plaintiff's market share and reputation would be impossible to quantify. Equally difficult to quantify would be the harm stemming from broader dissemination of the alleged trade secrets. The danger of these longer-term, unquantifiable damages cuts strongly in favor of an injunction, as defendants could not otherwise compensate plaintiff if the injunc-

---

5. Transcript of Oral Argument, Sept. 23, 1999 ("Tr."), at 10.

6. *See, e.g., Foulke by Foulke v. Foulke,* 896 F.Supp. 158, 162 (S.D.N.Y.1995); *Holford USA Ltd. v. Cherokee, Inc.,* 864 F.Supp. 364, 374 (S.D.N.Y.1994).

7. Plaintiff agreed to such a carve out at oral argument. Tr. at 112. This is broader than the carve out permitted by the restraining order, which permits defendants to continue to develop of a copy of Bulldog, but does not allow for beta-testing.

tion were denied and plaintiff ultimately succeeded on the merits.

■ In light of the foregoing, the Court concludes that the balance of hardships tips decidedly in plaintiff's favor. While hardship to each side from an erroneous ruling on this motion is speculative, harm to plaintiff were defendants erroneously not enjoined is more likely and potentially more severe. Plaintiff but not defendants risk loss of proprietary information. And in the event that Bulldog would come to market prior to trial absent an injunction, the harm to plaintiff from an erroneous denial probably would be substantially greater than the harm to defendants from an erroneous grant. Because such damages largely would be unquantifiable and no adequate remedy at law exists, an injunction is an appropriate remedy provided plaintiff has established the requisite likelihood of success.

*Likelihood of Success*

This case came before the Court on an expedited basis. Though each party submitted voluminous expert reports, both experts made it clear that they did not have time to do all the necessary analysis. To the extent that conclusions can be drawn from the record to date regarding the merits of plaintiff's claims, the Court does so here.

Plaintiff's principal claims are for copyright infringement and theft of trade secrets. In short, plaintiff alleges that during defendant Shivaram's employment as a computer programmer at Tradescape, Shivaram took Tradescape's computer code, which Tradescape alleges is both a trade secret and protected by copyright, without authorization and used this information to develop Bulldog. Plaintiff has submitted evidence showing some similarity between the source code used in Tradescape and that of Bulldog. The extent of the similar-

ity and the reasons therefor are highly disputed.

*Copyright Infringement*

■ Copyright infringement generally is established by showing "(a) that the defendant had access to the copyrighted work and (b) the substantial similarity of protectible material in the two works."[8] This test assumes as a preliminary matter that plaintiff has a valid copyright registration for the allegedly infringed material.

Defendants argue that plaintiff is unlikely to prevail under this test for three reasons: (1) plaintiff has failed to prove copyright registration for the allegedly infringed version of the Tradescape program; (2) assuming *arguendo* that plaintiff has a registered copyright in the allegedly infringed program, that registration is invalid; and (3) Bulldog is not substantially similar to Tradescape's program.

1. *Registration of the Allegedly Infringed Software*

■ The issuance of a certificate of copyright registration ordinarily is a prerequisite to the commencement of an action for infringement.[9] At oral argument of this motion, defendants disputed the existence of certificates for the allegedly infringed works. In order to evaluate this contention, however, it is necessary to trace the manner in which the issue arose.

The complaint and a declaration, both filed on August 18, 1999, alleged that Tradescape had received a certificate of registration for its entire executor server on August 13, 1999 and that it had been advised that certificates had been issued subsequently for a number of other programs.[10] The complaint alleged copying of both the executor server and the other

---

8. *Kregos v. Associated Press*, 3 F.3d 656, 662 (2d Cir.1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994).

9. 17 U.S.C. § 411.

10. Cpt ¶¶ 17–20; Khan Decl. ¶¶ 2–3 & Ex. 1.

programs.[11] The Court regards the copyright infringement cause of action as resting on both the executor server and quote server programs.[12]

Defendants' opposing memorandum, dated September 13, 1999, asserted that "none of the code that is allegedly infringed exists in the copyrighted version of Tradescape,"[13] presumably the executor server with respect to which the August 13 certificate had been issued. For reasons that will be discussed in greater detail below, however, this contention was not supported by a comparison of a deposit copy of the copyrighted program with the accused work. Rather, defendants argued that the accused work could not have infringed the copyrighted executor server because (a) the application for registration of the copyrighted program was filed in January 1999, only shortly after Shivaram began working for plaintiff, and (b) the copyrighted program was written in Visual Basic whereas the accused work is written in C++.[14]

■ Defendants' contention is unpersuasive. The first argument is baseless because the issue, as far as copyright infringement is concerned, was not whether Shivaram wrote the allegedly infringed program, but whether he copied it. And while the difference in programming languages is relevant to the issue of infringe-

ment, the simple fact that the accused work is in a different language does not in itself defeat plaintiff's claim because a copyright affords its holder the exclusive right, among others, to produce derivative works.[15] Indeed, defendants so conceded at argument.[16]

At oral argument, however, defendants modified their position. They asserted that plaintiff in September had obtained another registration on their quote server, that the registration from the Copyright Office did not contain lines of code found in Bulldog, and that plaintiff therefore had failed to establish that the allegedly infringed code appearing in the accused work actually is part of the registered program.[17] These contentions, however, were simply assertions of counsel, unsupported by any evidence.

This *contretemps* is a product of the peculiarities of the regulations relating to registration of copyright in computer programs as distinguished from literary and other works. While an applicant for registration of copyright in, for example, a book must deposit a complete copy of the book, the Copyright Office permits an applicant for registration of a computer program containing trade secrets to deposit a redacted version of the program, which may be as little as the first and last 25 pages of the source code with portions containing

11. Cpt ¶ 21.

12. The infringement claim in the complaint rested only on the executor server. *Id.* ¶ 89. *See also* Pl. Mem. 19 (alleging infringement of executor server). It is not entirely clear why the allegation of infringement was so limited. In view of the fact that the complaint alleges that certificates first were issued with respect to the other programs on August 17, 1999, the day prior to the filing of the complaint, however, it may be that the complaint had been prepared before that information was received and that counsel did not make all the changes to the draft pleading that were appropriate in light of the issuance of the additional certificates. In any case, plaintiff subsequently produced a copy of the certificate of registration for its quote server. Carlinsky Reply Decl. ¶ 9 & Ex. 8. Nevertheless, the

parties have treated the issue of infringement of the quote server as being in the case. Accordingly, the Court deems the pleadings amended to include a claim of infringement of that copyright as well. *See* FED. R. CIV. P. 15(b).

13. Defendants' Memorandum of Law ("Def.Mem.") at 11.

14. *Id.*

15. 17 U.S.C. §§ 101 (definition of derivative work), 106(2) (exclusivity of right): *see Radji v. Khakbaz,* 607 F.Supp. 1296 (D.D.C.1985) (translation is derivative work).

16. Tr. at 28.

17. Tr. at 29–30.

trade secrets deleted.[18] Plaintiff appears to have chosen this option.[19] In consequence, there may be, and in this case is, some uncertainty as to whether allegedly infringed code actually is the subject of an existing registration.

The burden of course is on the plaintiff to show that allegedly infringed code is covered by a valid registration. As explained above, however, plaintiff's showing on this motion is at least adequate to raise serious questions for litigation as to whether the version of the executor server that was covered by the August 13, 1999 certificate is infringed by Bulldog. Moreover, plaintiff alleged copying of other programs, including the quote server as to which a certificate of registration was issued after the commencement of the action. In view of the fact that defendants' attack on the registration for the quote server is unsupported by evidence and, in any case, first was voiced at oral argument, the Court is unprepared to give it any weight at this stage of the proceedings.

2. *Validity of Plaintiff's Copyrights*

■ A certificate of registration from the Copyright Office constitutes *prima facie* evidence that a copyright is valid.[20]

This presumption of validity, however, is rebuttable "[w]here other evidence in the record casts doubt on the question." [21]

■ In this case, defendants contend that much of Tradescape's programs were taken directly from another day trading software application, Marketware, and were not "original" to Tradescape, as Tradescape claimed on its applications for registration.[22] As plaintiff deliberately falsified its registration applications, defendants argue, the copyrights are invalid.[23] Defendants, however, have failed to meet their burden on this point in two respects.

First, the evidence that the Tradescape program was copied from Marketware is not persuasive. While defendants have offered some expert testimony to support their contention,[24] plaintiff has disputed the point with expert testimony and other evidence of its own.[25] At this stage, defendants' evidence is not sufficiently strong to overcome the presumption of validity arising from Tradescape's registrations. The matter remains a fair ground for litigation.

Second, defendants have put forth no evidence that plaintiff's misstatement, if there was one, was deliberate.[26] Without the requisite showing of *scienter*, defendants cannot rebut the presumption of va-

18. 37 C.F.R. § 202.20(c)(2)(vii) (1999); *see also* 5 Melville B. Nimmer & David Nimmer, Nimmer on Copyright ("Nimmer") § 21.02[A], at 21–92 to 21–93 (1999).

19. Defendants suggest that the usual practice is to submit a redacted version of the code to the Copyright Office and to escrow a complete version of the code in case the copyright is ever litigated. Tr. at 31–32. Though this may be a common practice, it does not appear to be required by the Copyright Office. *See* 5 Nimmer § 21.02[A], at 21–92 to 21–93 (1999). In any event, plaintiff did not do this, leading to the current confusion over the contents of the copyrighted version of the program.

20. 17 U.S.C. § 410(c). *See also Fonar Corp. v. Domenick*, 105 F.3d 99, 104 (2d Cir.1997) (citing *Durham Indus., Inc. v. Tomy Corp.*, 630 F.2d 905, 908 (2d Cir.1980)).

21. *Fonar*, 105 F.3d at 104; *Durham Indus.*, 630 F.2d at 908.

22. Def. Mem. at 12.

23. *Id.* at 12–13.

24. *See* Expert Report of Bruce F. Webster ("Webster Rept.") ¶¶ 116–20.

25. Klausner Rebuttal Rept. at 18–19; Wintringham Decl. ¶¶ 6–7 & Ex. 3.

26. Deliberate falsification on a copyright application may invalidate the registration. *See Fonar*, 105 F.3d at 105; *Eckes v. Card Prices Update*, 736 F.2d 859, 861–62 (2d Cir.1984); *Original Appalachian Artworks, Inc. v. Toy Loft, Inc.*, 684 F.2d 821, 828 (11th Cir.1982). As the *Original Appalachian Artworks* court held, however, inadvertent failure to identify preexisting works is not alone ground to invalidate a registration. 684 F.2d at 828.

lidity created by the registration. Defendants have failed to meet their burden on this point as well and so fail to rebut the presumption of validity.[27]

### 3. Substantial Similarity

Defendants contend lastly that Bulldog bears no substantial similarity to any protectible material found in Tradescape.[28]

■ Analysis of these allegations is complicated by the fact that many elements of a computer program serve a utilitarian function and are not wholly expressive, so much of the program may be unprotectible. In consequence, the Court must determine not only whether similarities between the programs exist, but also whether any similarities are in respect of original, expressive elements of the program, the only aspects protected by copyright law.[29]

The leading case on software copyright infringement in this circuit is *Computer Associates International, Inc. v. Altai, Inc.*[30] The case involved allegations by Computer Associates ("CA") that Altai had infringed the copyright on ADAPTER, the operating system compatibility component of a job scheduling program designed by CA called CA–SCHEDULER. After the claim was filed, Altai's president learned that a dissident CA programmer who had come to work for Altai had copied significant portions of the ADAPTER source code verbatim into OSCAR 3.4 without Altai's knowledge. Altai then excised the copied portions, which constituted about 30 percent of OSCAR 3.4's code, and rebuilt the program using the remaining non-copied segments of code. The new version was entitled OSCAR 3.5.

At trial, Altai was found liable for copying ADAPTER into OSCAR 3.4, but not for development of OSCAR 3.5. On appeal, CA challenged this latter finding, arguing that software copyright infringement can exist with respect not only to the literal components of a program (*i.e.*, the source and object code), but also to the program's non-literal elements (*i.e.*, its "fundamental essence or structure"). Though OSCAR 3.5 contained none of the literally copied code found in OSCAR 3.4, CA contended that it nonetheless infringed ADAPTER by imitating its non-literal structure.

At the outset, the Circuit agreed with CA that the non-literal elements of a computer program are protectible by copyright, analogizing to case law concerning protection of literary property.[31] The court then laid out a framework for comparison of non-literal elements of computer software. Drawing from Nimmer's treatise on copyright,[32] it set forth the " abstraction-filtration-comparison" test, which aims to sift out protectible expression in the allegedly infringed work from unprotectible material in order to determine which non-literal elements of the program are protected by copyright.

The "abstraction-filtration-comparison" method of analysis works as follows. To begin, the court dissects the allegedly infringed program into levels of abstraction in a kind of "reverse engineering on a

27. In order to rebut successfully the presumption of validity, defendants must show that, had the misstatement not been made, the Copyright Office might have rejected the application. *See Eckes*, 736 F.2d at 861–62 (citing *inter alia Russ Berrie & Co., Inc. v. Jerry Elsner Co., Inc.*, 482 F.Supp. 980, 988 (S.D.N.Y.1980)).

28. Def. Mem. at 13–22.

29. The Copyright Act grants copyright protection only to "original works of authorship."

1 Nimmer § 2.01, at 2–6 (1999) (citing 17 U.S.C. § 102(a)).

30. 982 F.2d 693 (2d Cir.1992). *See also Softel, Inc., v. Dragon Medical and Scientific Communications, Inc.*, 118 F.3d 955, 963 (2d Cir.1997) (endorsing the *Altai* approach).

31. *Altai*, 982 F.2d at 701–02 (citing 3 Nimmer § 13.03[A][1], at 13–24 (1991)).

32. *See* 4 Nimmer § 13.03[F], at 13–113 to 13–147 (1999).

theoretical plane." [33] The purpose of this exercise is to provide an anatomical diagram of the allegedly infringed program.

" 'At the lowest level of abstraction, a computer program may be thought of in its entirety as a set of individual instructions organized into a hierarchy of modules. At a higher level of abstraction, the instructions in the lowest-level modules may be replaced conceptually by the functions of those modules. At progressively higher levels of abstraction, the functions of higher-level modules conceptually replace the implementations of those modules in terms of lower-level modules and instructions, until finally, one is left with nothing but the ultimate function of the program.' " [34]

After dissecting the allegedly infringed program into levels of abstraction, the court then employs the "successive filtering method" to separate protected expression from non-protectible material in order to determine the scope of plaintiff's copyright.[35] This involves sifting through the levels of abstraction to filter out the non-literal features of the program that are either (1) unprotectible ideas or (2) otherwise non-expressive material, including that dictated by efficiency [36] or external factors,[37] or derived from the public domain.[38] In all of these instances, the material under scrutiny lacks the expressive qualities that merit copy-

right protection. What is left is deemed by the court the "golden nugget" of protectible expression.[39]

The final step of the abstraction-filtration-comparison analysis involves comparison of this "golden nugget" with the allegedly infringing program. This is a two-step inquiry, involving comparison for substantial similarity and then assessment of the relative importance of the copied material, if the court finds any.[40] To the extent that the allegedly infringing material bears substantial similarity to the "golden nugget," and to the extent that the copied material is relatively important to the plaintiff's overall program, the defendant has infringed.

Although the court in *Altai* applied the abstraction-filtration-comparison test to analyze copying of ADAPTER's non-literal aspects only, as it was acknowledged that OSCAR 3.5 did not contain any literal copying, the test is well suited also for comparing a program's literal elements. Although any observer can look at two lines of code and say whether they are the same, code similarities alone do not necessarily give rise to an inference of copying. Some are not actionable for the reasons discussed in *Altai* –because the code at issue is not original to the author, but dictated by efficiency or external considerations, or derived from the public domain.

33. *Altai*, 982 F.2d at 707.

34. *Id.* (citing Steven R. Englund, Note, *Idea, Process or Protected Expression?: Determining the Scope of Copyright Protection of the Structure of Computer Programs*, 88 MICH. L.REV. 866, 897–98 (1990)).

35. *Id.* at 707 (citing 3 NIMMER § 13.03[F] (1991)).

36. The court here draws upon the merger doctrine, which holds that where an idea can only be expressed one way, the expression merges with the idea and therefore is non-protectible. *Id.* at 707–08. By the same logic, the court holds that where efficiency dictates that an idea be expressed in a particular way, that expression also merges with the idea and is non-protectible. *Id.* at 708–09.

37. This draws on the doctrine of *scenes a faire*, which denies protection to elements that are standard for carrying out the particular theme of a work and not products of the creator's imagination. *Id.* at 709. In the software context, these standard elements include those dictated by hardware or software requirements, including programming language or operating system constraints, the computer manufacturer's designs standards, business practices and technical requirements of the target end user, and standard computer programming practices. *Id.* at 709–10.

38. *Id.* at 710.

39. *Id.*

40. *Id.*

This contrasts to analysis of alleged infringement in a literary work, where identical text is strongly suggestive of copying. *Altai'* s framework thus provides a tool to address this difficulty by filtering out non-protectible code from the "golden nugget" of protectible expression, thereby avoiding erroneous overextension of the scope of copyright protection.

■ Though this is a matter of first impression in this circuit, at least two other circuits have held the *Altai* filtration test applicable to analysis of literal copying.[41] Their reasoning is persuasive. This Court therefore will apply the *Altai* framework to all of Tradescape's allegations of copying, including both literal and nonliteral elements of its day trading program.

### a. *Evidence of Literal Copying*

Part of Bulldog almost surely is a literal copy of Tradescape's software, although plaintiff's and defendants' experts differ regarding the extent of such copying.[42] Plaintiff points to several sections of the programs where code similarities are uncanny, including the color code map for plaintiff's screens, which is identical in both programs;[43] identical coding of the so-called "intensity" function, which governs intensity of colors and is used to make objects on the screen distinguishable from one another;[44] the appearance of empty source code modules or files in exactly the same location in both programs;[45] and the same or similar bug fixes in both programs.[46]

Defendants contend that the identical code in the two programs does not indicate copying, but is merely a product of efficiency dictates, external considerations, and material in the public domain.[47] For instance, defendants claim that similarities between each program's "TCPNoDelay" bug fix result from the fact that the fix is simply a well-known, efficient solution to the common problem of network message buffering rather than an original product of a programmer's imagination.[48] Defendants therefore argue that Tradescape's bug fix is not protectible and does not constitute part of the "golden nugget" to be compared. Along similar lines, defendants attribute other code similarities between Tradescape and Bulldog to other external factors including industry standard protocols,[49] programming language dictates,[50] Shivaram's coding standards and style,[51] common authorship,[52] Shivaram's personal tool kit solutions,[53] and "ob-

41. See *Bateman v. Mnemonics, Inc.*, 79 F.3d 1532, 1545 (11th Cir.1996); *Gates Rubber Co. v. Bando Chemical Industries, Ltd.*, 9 F.3d 823, 842–45 (10th Cir.1993); *but see Lotus Development Corp. v. Borland Intern., Inc.*, 49 F.3d 807, 815 (1st Cir.1995).

42. Plaintiff's expert identifies over 4,000 lines of identical source code, whereas defendants' expert acknowledges at least 1,182 such lines. *See* Klausner Rebuttal Rept. at 3 & Ex. 1; Webster Rept. ¶¶ 71–72.

43. Expert Report of David Klausner ("Klausner Rept.") at 14–16 & Ex. G.

44. *Id.* at 17 & Ex. H.

45. Klausner Rebuttal Rept. at 6–7.

46. Klausner Rept. at 9–13 & Ex. B, C, D, E; Klausner Rebuttal Rept. at 5, 23–25.

47. Def. Mem. at 15–21.

48. Webster Rept. ¶ 96.

49. *Id.* ¶¶ 69, 87; Def. Mem. at 16–17. Apparently, both day trading systems use industry standard protocols to communicate with the NASDAQ and Island systems, external sources that provide quote and trading information and permit customers to execute trades. These protocols are published by NASDAQ and Island and are required to be included in day trading software systems that utilize these sources. *See* Webster Rept. ¶ 51; Shivaram Decl. ¶¶ 45, 49–50; Shivaram Aff. ¶¶ 15–16, annexed to Carlinsky Decl. at Ex. 3.

50. Webster Rept. ¶ 43.

51. *Id.* ¶¶ 80–84.

52. *Id.* ¶¶ 88–89.

53. *Id.* ¶¶ 74–76.

ject oriented development," a common programming technique.[54] They contend that these factors explain most if not all of the allegedly copied code, none of which falls into the "golden nugget" of protected material in Tradescape, if there is such a nugget to begin with.[55] To the extent there are any similarities between the two programs, the argument goes, such similarities are not original products of the programmer's imagination, but instead are utilitarian in nature and not actionable.[56]

Although defendants have suggested several possible explanations for the similar code identified by plaintiff's expert, they generally fail to establish that any particular similarity is attributable to any particular external source. In contrast, plaintiff has made some convincing arguments as to why at least some of the patent similarities cannot be attributable to the external sources named by defendants.[57] In short, defendants have done little more than lay out circumstances that, in theory, might explain similarities between two programs without offering convincing proof that *these* similarities may be so explained. The Court is not now persuaded that the theoretical explanations proffered by defendants are sufficient to dispose of the strong evidence of at least some direct copying addressed by plaintiff.

Defendants' argument is undermined even further by the fact that Bulldog contains remarkable instances of similarities to plaintiff's software in the programmer's comments, which are non-executable appendages to lines of executable code. These similarities include comments identical to the point of repeated spelling errors.[58] In one notable instance, the line "Dont do anyting" appears as a programmer's comment in both Tradescape and Bulldog, with identical misspellings in both.[59] Errors such as this strongly suggest copying. They are not readily explained by any of the *Altai* factors, and defendants offer no plausible alternative explanation. Indeed, the Court can think of none.

### b. *Evidence of Non–Literal Copying*

The evidence concerning non-literal similarities permits fewer ready conclusions, perhaps because plaintiff's expert has had little time to analyze defendant's software for this purpose. Plaintiff suggests that the architecture of the two programs,[60] as well as the structure of each program's "quote server,"[61] the feature that retrieves real time stock quotes and makes them available to the end user, are similar. Defendants deny any architectural similarities[62] and insist that its program does not even have a quote server, but rather utilizes a "Market Data Multiplier" to retrieve quotes.[63]

Plaintiff submits little evidence to support its allegations of non-literal copying. In consequence, it remains unclear to the Court both whether the non-literal elements cited by plaintiff form part of the "golden nugget" of protectible material and whether there is any substantial similarity between such elements. However, although plaintiff's evidence on this point is underwhelming, the Court is not required at this stage to decide conclusively in plaintiff's favor, but merely to determine whether there are serious questions going to the merits. Further, although defen-

---

54. *Id.* ¶¶ 38–39.

55. Def. Mem. at 13–23.

56. *Id.*

57. Klausner Rept. at 9–17 & Ex. B, C, D, E, G, H; Klausner Rebuttal Rept. at 5–7; 23–25.

58. Klausner Rebuttal Rept. at 3 & Ex. 1; Pl.Ex. H–1.

59. Pl.Ex. H–1.

60. Wright Decl. ¶¶ 25–26.

61. *Id.* ¶ 27; Borzenko Decl. ¶ 12; Klausner Rebuttal Rept. at 21.

62. Shivaram Decl. ¶¶ 33–38.

63. Webster Rept. ¶ 55; Shivaram Decl. ¶ 33.

dants have articulated counter-arguments, their evidence also is incomplete and not wholly convincing. Therefore, at this point, the Court can conclude only that there are serious questions of fact regarding copying of non-literal elements, particularly given the substantial evidence of literal copying put forth by plaintiff.

### 4. *Circumstantial evidence of copying*

To bolster its evidence of direct copying, plaintiff has offered also circumstantial evidence of copying. It includes an alleged statement by a principal at Andover suggesting the existence of a Tradescape clone,[64] questions concerning the timing of Bulldog's appearance,[65] and a code identifier on several Bulldog files allegedly indicating that those files were either written on or taken directly from Tradescape's machines.[66] All of these allegations are heavily contested by defendants,[67] and the Court need not recapitulate all the facts here. Needless to say, such evidence, although admittedly disputed and not dispositive, lends further support to plaintiff's suggestion that defendants' actions were not completely above board and, in any case, to the assertion that serious questions exist for litigation.

 In the last analysis, the Court concludes that, while it is too early to ascertain whether plaintiff is likely to succeed on the merits of the copyright claim, plaintiff has raised sufficiently serious questions going to the merits of its copyright claim to make them fair ground for litigation.

64. Bundy Decl. ¶ 5.

65. Expert Report of Donald J. Reifer ("Reifer Rept."); Pl.Ex. H–3; Khalid Decl. ¶¶ 2–3.

66. Klausner Rebuttal Rept. at 7 & Ex. 5.

67. *See* Webster Rept. ¶¶ 44–49; Shivaram Decl. ¶¶ 27–30, 57–59; Laurent Aff. ¶¶ 3, 17–18; Second Expert of Bruce F. Webster ("Second Webster Rept.").

68. *See Altai,* 982 F.2d at 717.

### *Misappropriation of Trade Secrets*

 As plaintiff has met its burden on the copyright claim, there is no need to explore in depth the merits of the trade secrets claim. Suffice it to say that computer software indisputably is a subject of trade secret protection.[68] In this case, despite defendants' insistence to the contrary, there is substantial evidence that defendant Shivaram was bound by a confidentiality agreement while working for Tradescape.[69] Plaintiff appears to have taken reasonable measures to protect its source code.[70] The direct and circumstantial evidence of copying is strongly suggestive of misappropriation. Plaintiff therefore has presented enough evidence to raise serious going to the merits of the trade secrets claim to support the issuance of a preliminary injunction.[71]

### *Conclusion*

For the foregoing reasons, the motion for a preliminary injunction is granted to the extent hereinafter indicated.

1. Defendants Shivaram and Meyers, and all persons in active concert and participation with them who receive actual notice of this order, are enjoined and restrained, pending hearing and determination of the action,

a. From, directly or indirectly, utilizing, divulging, copying, cloning, recreating, licensing and/or modifying plaintiff's confidential and proprietary information and/or trade secrets, including but not limited to plaintiff's source codes and other computer codes, computer programs and software,

69. O. Amanat Decl. ¶¶ 5–6 & Ex. 2, 3.

70. I. Amanat Decl. ¶¶ 3–8.

71. Any difficulty plaintiff may in establishing that the allegedly infringed software is the subject of registration does not relate to the trade secret claim. Therefore, the trade secret claim reinforces the likelihood that plaintiff will succeed on the merits even if it were unable to prove that the allegedly copied software is registered.

day trading software, algorithms, strategic plans, and any and all documents, computer files, computer diskettes, or information that defendants may have derived from plaintiff's confidential and proprietary information and/or trade secrets, and/or the software identified by defendants as "Bulldog" and any component subsystem thereof (except that Shivaram and Meyers shall be permitted to develop or modify a copy of the "Bulldog" program including beta testing with no more than two live copies);

b. To comply with clause b. of the second decretal paragraph of the order to show cause for preliminary injunction, temporary restraining order, and order for expedited discovery entered herein by Judge Chin (the "TRO"); and

c. To comply with clause c. of the second decretal paragraph of the TRO insofar as it pertains to retention of the "Bulldog" program as it existed at noon on August 18, 1999.

2. This order is conditioned upon Tradescape giving security in the sum of $10,-000 for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained hereby. The Court fixes this figure in light of defendants' professed intention not to go forward with the development and marketing of Bulldog. Defendants may request that the amount be increased if they believe it necessary.

SO ORDERED.